# United States Court of Appeals
## <u>For the First Circuit</u>

No. 04-2577

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

JG-24, INC.; JORGE ORTIZ; GLORIA ALVAREZ, a/k/a
GLORIA ORTIZ; DURA MAS, INC.; REAL PROPERTY LOCATED
AT PR ROAD #675, KM. 4.0, BARRIO BAJURAS SECTOR LOS
CHORROS, VEGA ALTA, PUERTO RICO,

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Raymond L. Acosta, <u>Senior U.S. District Judge</u>]

---

Before

Boudin, <u>Chief Judge</u>,

Cyr, <u>Senior Circuit Judge</u>,

and Lipez, <u>Circuit Judge</u>.

---

<u>Julie A. Soderlund</u> for appellant.
<u>Robert H. Oakley</u>, Attorney, Environment & Natural Resources
Division, with whom <u>Sue Ellen Wooldridge</u>, Assistant Attorney
General, <u>James C. Kilbourne</u>, and <u>Elizabeth Yu</u>, Attorneys,
Environment & Natural Resources Division, were on brief for
appellee.

---

February 16, 2007

---

**CYR**, **Senior Circuit Judge**.  The owners and operators of two fiberglass manufacturing facilities in Puerto Rico appeal from a district court judgment which determined them jointly and severally liable for the costs of a hazardous-substance removal action conducted by the United States Environmental Protection Agency (EPA) pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a) (CERCLA), and imposing civil penalties for their failure to respond in writing to the EPA's request for information pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6927(a) (RCRA).  We affirm.

## I

## BACKGROUND

Between 1992 and 2000, JG-24, Inc. ("JG-24"), a company wholly owned by Jorge Ortiz and Gloria Alvarez, operated a fiberglass manufacturing facility in Vega Alta, Puerto Rico ("Vega Alta site"), which utilized various materials (e.g., styrene, acetone) classified as "hazardous substances" under CERCLA, 40 C.F.R. § 302.4.  Ortiz also owned Fiberglass Dura Mas, Inc. ("Dura Mas"), which operated another fiberglass manufacturing and storage facility in nearby Cataño, Puerto Rico ("Cataño site").

In December 1997, EPA inspectors visited the Vega Alta site, observed large leaking metal drums scattered throughout the site, and detected the strong odor of airborne solvents.  In

February 1998, the EPA obtained a warrant to conduct another inspection, and soil samples tested positive for CERCLA-regulated hazardous substances. Thereafter, defendants declined to comply with the administrative notices of mandatory access to the site issued by the EPA.

In April 1999, the EPA obtained a warrant to conduct a removal evaluation inspection at the Vega Alta site, which inspectors described as a "war zone," containing hundreds of deteriorating and leaking drums strewn throughout the site, evidence that waste materials had been burned or buried below ground, and high concentrations of airborne styrene and acetone vapors. Tests revealed that the drums and surrounding soil not only contained hazardous substances regulated by CERCLA, but also highly flammable hazardous waste prohibited by RCRA, which strictly regulates the manner in which these wastes must be stored and disposed.

Following its April 1999 inspection, the EPA determined to undertake a removal action at the Vega Alta site, based on its express findings that (i) the metal drums continued to deteriorate and discharge CERCLA-regulated hazardous substances; (ii) preliminary soil sample tests descried high concentrations of those hazardous substances; (iii) this eflux created a fire risk, and because the site is situated on porous limestone atop a groundwater aquifer, it jeopardized local drinking water supplies; (iv) no

other federal or state agency was equipped to undertake the cleanup; and (v) since the threatened release, migration, and fire were imminent, the removal action should be exempt from the normal $2 million cost cap, see 42 U.S.C. § 9604(c)(1). See 40 C.F.R. § 300.415(b)(2); infra notes 2 & 4. When the EPA notified the defendants of the EPA decision, defendants repeatedly refused to permit EPA access to the site.

In August 2000, the EPA commenced the instant CERCLA and RCRA actions against the defendants in the federal district court. The EPA then obtained a court order for unimpeded access to the Vega Alta site, and during the period from October 2000 through August 2001, it removed from the site seven hundred cubic yards of soil contaminated with hazardous substances and two thousand five hundred leaking drums from its surface and subsurface.

During August 2001, the EPA also discovered one hundred leaking drums at the nearby Cataño site, and issued a RCRA Notice of Violation and Information Request to Dura Mas and Ortiz for company data concerning what (if any) hazardous substances had been stored or disposed of at the facility. See 42 U.S.C. § 6927(a); infra note 7. Defendants failed to respond to the information request.

Subsequently, the EPA amended its complaint in the pending federal court action to seek, inter alia, recovery of its removal costs at the Vega Alta site (approximately $4.1 million),

and civil penalties for defendants' failure to respond to the August 2001 Information Request at the Cataño facility.  See 42 U.S.C. § 6928(a)(1).[1]

Following a nine-day bench trial, the district court held that defendants JG-24, Ortiz, and Alvarez were jointly and severally liable for all costs of the removal action at the Vega Alta site, then imposed $263,000 in civil penalties against Dura Mas and Ortiz for failure to comply with the August 2001 Information Request for the Cataño site.  United States v. JG-24, Inc., 331 F. Supp. 2d 14, 75 (D.P.R. 2004).  Defendants appeal from the judgment.

---

[1]The RCRA penalty provision provides, in pertinent part:

[W]henever on the basis of any information the Administrator determines that any person has violated or is in violation of any requirement of this subchapter, the Administrator may issue an order assessing a civil penalty for any past or current violation, requiring compliance immediately or within a specified time period, or both, or the Administrator may commence a civil action in the United States district court in the district in which the violation occurred for appropriate relief, including a temporary or permanent injunction.

42 U.S.C. § 6928(a)(1).

**II**

**DISCUSSION**

**A.** **The EPA's Characterization of the Cleanup as a "Removal Action"**

Appellants first contend that the district court erred in finding them liable for the EPA's response costs at the Vega Alta site, in that the EPA's cleanup action was inconsistent with the National Contingency Plan (NCP), 40 C.F.R. pt. 300 (2004), and thus cannot satisfy the CERCLA definition of a "removal action." See 42 U.S.C. § 9601(23).[2] Appellants specifically argue that the EPA action was inconsistent with the NCP because, inter alia, (i) the

_____

[2]Subsection 9601(23) defines "remove" or "removal" as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [to take] in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). By contrast, a "remedial action" is defined as:

> [T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

Id. § 9601(24).

NCP requires that a removal action begin "as soon as possible" after discovery of contamination, see United States v. W.R. Grace & Co., 429 F.3d 1224, 1233 (9th Cir. 2005), cert. denied, 127 S. Ct. 379 (2006) (quoting 40 C.F.R. § 300.415(b)(3)), whereas the EPA waited twenty-one months to begin the removal at the Vega Alta site; and (ii) a "Final Pollution Report" issued in October 2002 refutes the district court's factual finding that there were significant levels of RCRA hazardous substances found at the Vega Alta site, and therefore undercuts the court's related decision that the EPA reasonably decided to undertake a CERCLA removal action. They suggest that, as a consequence of this mischaracterization of the cleanup as a "removal action," the EPA should be liable on their Federal Torts Claims Act (FTCA) counterclaim for damages to the site resulting from the cleanup, and/or the EPA should not be permitted to recover costs in excess of the $2 million cost cap permitted for some removal actions.

Questions concerning the interpretation of CERCLA normally are reviewed de novo, see Am. Cyanamid Corp. v. Capuano, 381 F.3d 6, 12 (1st Cir. 2004), with appropriate deference given to agency interpretations, see Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984), and the EPA's decision whether to conduct a removal action is reviewed under the deferential "arbitrary and capricious" standard, 42 U.S.C. § 9613(j)(2). Since appellants did not raise their legal arguments below, however, the

arguments are forfeited, and we review them on appeal for plain error only,[3] which requires that appellants demonstrate (i) an error (ii) which was clear or obvious and which not only (iii) affected their substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings. See Cipes v. Mikasa, Inc., 439 F.3d 52, 55-56 (1st Cir. 2006).

We perceive no "clear or obvious" error. The contention that the cleanup of the Vega Alta site was inconsistent with the

---

[3]Appellants filed no reply brief to the government's contention that they did not preserve these "removal action" issues in the district court, see Gonzalez v. El Dia, Inc., 304 F.3d 63, 74 (1st Cir. 2002) (noting that party's failure to file a reply brief contesting the opposing party's allegations of forfeiture is itself some evidence that the issues were forfeited), nor has our independent review of the record unearthed any articulation of these legal issues by the defense below. At oral argument, the appellants contended that issue preservation occurred when the district court announced that it would assume, without taking expert evidence, that the EPA's cleanup was properly characterized as a "removal action." We disagree. At that juncture, appellants' trial counsel should have notified the court – but did not – that appellants were contesting the EPA's characterization of the cleanup as a removal action. Appellants also maintain that they preserved the legal issues merely because the appellate record contains all the facts necessary to decide them. This contention is patently absurd. Many hypothetical legal issues may lurk in a given factual record, yet the district court is not obligated to reach such issues absent counsels' explicit identification of the legal questions actively disputed. Indeed, given that appellants' legal contentions turn in part on whether the EPA's cleanup was "inconsistent" with the NCP, their failure to raise these contentions deprived the government of the opportunity to develop a factual record refuting the alleged inconsistency. See Cool Moose Party v. Rhode Island, 183 F.3d 80, 83-84 (1st Cir. 1999) (noting that finding of forfeiture is "particularly appropriate" where preservation would have enabled further development of factual record below).

NCP because the EPA did not initiate it "as soon as possible" after discovery of contamination falls well short of the mark. Appellants rely on W.R. Grace, in which the court merely noted that, in some circumstances, the manner in which the EPA executes a cleanup plan may undercut or belie its initial characterization of the plan as a "removal action." 429 F.3d at 1232-34 (finding, however, that EPA did comply with 40 C.F.R. § 300.415(b)(3)). For example, because the EPA's initial characterization depended on its determination of an imminent risk of fire and aquifer contamination at the Vega Alta site, see 40 C.F.R. § 300.415(b)(2),[4] one would

---

[4]NCP regulations require the EPA to consider eight factors before deciding whether to conduct a removal action:

(i)        Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

(ii)      Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii)    Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv)    High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v)     Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi)    Threat of fire or explosion;

(vii)   The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii)  Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

expect a reasonably expeditious execution of the cleanup plan. Appellants' predicament, however, is threefold.

The appellate record demonstrates that the EPA's April 1999 inspection described the Vega Alta site as a "war zone" littered with exposed flammable hazardous materials, and the EPA made all the statutorily required factual determinations pursuant to § 300.415(b)(2) necessary to its initial characterization of the cleanup as a "removal action." Further, a delay of twenty-one months is not per se unreasonably dilatory, and in part because of appellants' failure to raise the legal issue below, the appellate record contains no factual basis from which we fairly might assess whether twenty-one months was not reasonably prompt either in terms of the average execution time of EPA cleanups in general, or of cleanups conducted in comparable circumstances. Finally, appellants are in an especially poor position to argue that any prorogation of the cleanup efforts was unreasonable, given their repeated refusals voluntarily to allow EPA access to the site, which required that the EPA seek warrants to enter. Absent record foundation, appellants cannot begin to demonstrate any error which was "clear or obvious." W.R. Grace, 429 F.3d at 1245 ("Once we determine that a response action on the whole is, by nature, classified as a removal action under the law, we will not delve

---

40 C.F.R. § 300.314(b)(2).

further to second-guess the underlying data absent a showing of specific evidence that the EPA's conclusions were not warranted.").

Likewise, we discern no "clear or obvious" error based on the appellants's assertion that a "Final Pollution Report" refutes the district court's finding that there had been significant levels of RCRA hazardous substances stored and disposed of at the Vega Alta site, and therefore undermines the court's related decision that the EPA was not arbitrary or capricious in undertaking a CERCLA removal action. The Final Pollution Report was issued in October 2002, long after the EPA initially characterized the cleanup as a removal action, and a year after it initiated the cleanup. Under CERCLA, judicial review normally is limited to the administrative record as it existed at the time of the challenged agency action. See Camp v. Pitts, 411 U.S. 138, 142 (1973). That contemporary record, including the portentous results of the EPA's April 1999 inspection, graphically depicts Vega Alta as a "war zone" with hundreds of deteriorating and leaking drums strewn throughout the property, evidence that waste materials had been buried below ground, and high concentrations of styrene and acetone vapors in the air. Normally, we do not allow supplementation of the administrative record unless the proponent points to specific evidence that the agency acted in bad faith. See Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1458-59 (1st Cir. 1992). At most, appellants charge that the Final Pollution Report

proved the EPA wrong or overcautious in its initial assessment of the RCRA threat. Yet more importantly, the government aptly notes that the Final Pollution Report purports to detail only those RCRA wastes recovered during the excavation, and does not preclude a finding – based on the condition of the property (e.g., blatant evidence that appellants previously had burned RCRA wastes) – that substantial amounts of these RCRA wastes already had been stored and/or disposed of at the site during appellants' pre-cleanup operations which could not be recovered during the removal action. Appellants also fail to specify how the district court's RCRA findings – whether or not refuted by the Final Pollution Report – undercut the district court's discrete finding that the EPA's initial assessment of the CERCLA violations at the Vega Alta site was neither arbitrary nor capricious. See Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 76 (1st Cir. 1999) (noting that CERCLA regulates the designated hazardous substances "however insignificant" the amount). A fortiori, appellants have not met their burden to demonstrate an error which was "clear or obvious."[5]

## B. Civil Penalties for Noncompliance with RCRA § 6927

Appellants Ortiz and Dura Mas next argue that the

---

[5]As we conclude that the district court did not commit plain error in upholding the EPA's characterization of the cleanup as a "removal action," we also must affirm its decision that the EPA properly exceeded the $2 million cost cap for removal actions, as well as its decision to dismiss appellants' FTCA counterclaim for damages.

district court erred in imposing civil penalties for their failure to respond to the EPA's August 2001 Information Request for the Cataño site because, only fourteen days after that request, the EPA made an on-site inspection, during which the EPA had the statutory authority to collect the requested information itself. See 42 U.S.C. § 6927(a).[6]

We normally review questions regarding the interpretation of RCRA provisions de novo, see Maine People's Alliance & Natural Res. Def. Council v. Mallinkrodt, Inc., 471 F.3d 277, 286 (1st Cir. 2006), giving appropriate deference to agency interpretations, see

---

[6]Section 6927(a) provides, in pertinent part:

For purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designated by the Administrator . . . furnish information relating to such wastes and permit such person at all reasonable times to have access to, and to copy all records relating to such wastes. For the purposes of . . . enforcing the provisions of this chapter, such officers, employees or representatives are authorized-

(1) to enter at reasonable times any establishment or other place where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from;

(2) to inspect and obtain samples from any person of any such wastes and samples of any containers or labeling for such wastes.

42 U.S.C. § 6927(a).

Chevron U.S.A., 467 U.S. at 843.  Appellants did not raise their statutory construction before the district court, however, so we again review only for plain error.  See Cipes, 439 F.3d at 55-56; supra note 3.

Any error in refusing to employ appellants' unarticulated statutory interpretation was not remotely "clear or obvious." Cipes, 439 F.3d at 55-56.  Appellants cite no case authority for the proposition that an intervening EPA inspection relieves a party of the responsibility to respond in writing to an RCRA Information Request.  The RCRA's plain language sets forth the two remedies as distinct and cumulative (viz., "furnish information relating to such wastes and permit such person at all reasonable times to have access") (emphasis added), which comports with Congress's expressed intention that the RCRA serve the broadest remedial purposes.  See United States v. Charles George Trucking Co., 823 F.2d 685, 689 (1st Cir. 1987).  "By authorizing the agency to mount inspections and to collect information from persons and entities involved with hazardous residues, § 6927(a) directly facilitates the government's ability to battle the polluters."  Id. (emphasis added).  As the party with the greatest knowledge and control of the pertinent records, the person receiving an Information Request is in the best position to cull the records with maximum efficiency.  Accordingly, we discern no plain error in the district court's decision to impose per diem civil penalties for appellants' conceded

noncompliance with the § 6927(a) Request.[7]

   **Affirmed**.

---

[7]Oddly, appellants also challenge – as "irrelevant" – the district court's decision to pierce the corporate veil of JG-24 and Dura Mas to impose strict liability on their individual owners and operators (viz., Ortiz and Alvarez).  They observe that CERCLA and RCRA already make the individual owners and operators of corporate polluters jointly liable for cleanup costs.  Appellants did not preserve this issue below.  If the veil-piercing is indeed irrelevant, however, they cannot show that the district court's decision "affected their substantial rights," and thus they cannot demonstrate plain error.  See Cipes, 439 F.3d at 55-56.