# United States Court of Appeals
## For the First Circuit

No. 13-2547

INTERNATIONAL JUNIOR COLLEGE OF BUSINESS AND TECHNOLOGY, INC.,
d/b/a International Junior College;

L'IMAGE EDUCATIONAL CORP.,
d/b/a Rogie's School of Beauty Culture,

Plaintiffs, Appellants,

v.

ARNE DUNCAN, in his official capacity as
Secretary of the United States Department of Education,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, Magistrate Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Ronald L. Holt, with whom Matthew L. Hoppock and Dunn &
Davison LLC, were on brief, for appellants.
Rosa E. Rodríguez-Vélez, United States Attorney, with whom
Nelson Pérez-Sosa, Assistant United States Attorney, and Jennifer
L. Woodward, Office of the General Counsel, United States
Department of Education, were on brief, for appellee.

September 16, 2015

**THOMPSON**, **Circuit Judge**.  The United States Department of Education ("DOE") Secretary decided through an administrative proceeding that International Junior College of Business and Technology, Inc. ("International") could not participate in certain federal student financial assistance programs because the school failed to comply with a requirement that for-private colleges derive at least 10 percent of their revenue from some source other than federal student aid.  International brought suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., in Puerto Rico district court to challenge the decision, but this effort was unsuccessful, as the court dismissed International's claims on summary judgment.  Now, International asks us to take another look at the agency's decision, arguing that the DOE Secretary erred in several respects.

We disagree, and so for the reasons discussed below, we affirm the court's summary judgment dismissal of International's claims.[1]

## BACKGROUND

These facts are not disputed by the parties, unless otherwise noted.  From 2005 to 2008, the relevant timeframe for this case, Title IV of the Higher Education Act of 1965, 20 U.S.C.

---

[1] The parties consented to conducting all the proceedings before a magistrate judge.  Therefore, we review the magistrate judge's decision as a final judgment of the court. Fed. R. Civ. P. 73(c).

§ 1070, et seq. ("Title IV"), authorized the federal post-secondary student aid loan and grant programs.[2] Under Title IV, students who were enrolled in qualifying educational programs at eligible post-secondary institutions and who met certain eligibility requirements could receive federal loans and grants to help pay for their tuitions. The schools, however, were given direct access to the students' funds and were in charge of disbursing the funds to students.

Under Title IV, for-profit, post-secondary educational institutions ("proprietary institutions of higher education") were permitted to participate in the Title IV aid programs if they met certain requirements. One such requirement was that they had to earn "at least 10 percent of [their] revenues from sources that are not derived from funds provided under [Title IV]." 20 U.S.C. § 1002(b)(1)(F)(2003). This requirement was known as the "90/10 rule", and according to the DOE, was enacted "to require proprietary institutions to attract students based upon the quality of their programs, not solely because the institutions

---

[2] The statute and some of the relevant implementing regulations have been amended multiple times, but the parties do not dispute that the regulations as they existed from 2005 to 2008 govern this case. The Higher Education Act was also reauthorized in 1998, and some portions were re-codified. We use the citations to the code as they existed during the relevant time period.

offer Federal student financial assistance."[3] Institutional Eligibility Under the Higher Education Act of 1965, as Amended, 59 Fed. Reg. 6446-01, 6448 (Feb. 10, 1994). "Thus, under the statute, these institutions must attract students who will pay for their programs with funds other than Title IV . . . program funds." Id.

While the Title IV statute set out some of the requirements for the 90/10 rule, it also charged the DOE Secretary with implementing regulations to address (among many other things) the standards for proprietary institutions' compliance with the 90/10 rule (and the DOE's enforcement of same). See 20 U.S.C. §§ 1002(b)(1)(F), 1094(c)(1999). So, the DOE Secretary promulgated numerous regulations to ensure proprietary institutions' adherence to the 90/10 rule and to ensure the institutions were appropriate fiduciaries for disbursing the students' funds. See 34 C.F.R. §§ 668.23(d), 668.82. For instance, participating institutions were required to submit annual financial audits to the DOE, which had to be completed by independent accountants. The auditors were specifically required to certify that the school derived at least 10 percent of its revenue from sources other than Title IV programs. The regulations also provided a formula the schools had

---

[3] The statute was originally enacted as the 85/15 rule, but was amended to the 90/10 rule in 1998. See Pub. L. No. 105-244, § 102(b)(1)(F), 112 Stat. 1581, 1588 (codified at 20 U.S.C. § 1002).

to use to calculate their revenues. Specifically, an institution only satisfied the 90/10 requirement if the Title IV funds the school received equaled 90 percent or less of "[t]he sum of revenues including [Title IV] program funds generated by the institution from: tuition, fees, and other institutional charges for students enrolled in [Title IV] eligible programs . . . ." 34 C.F.R. § 600.5(d)(1)(1999).

Failure to comply with the 90/10 rule meant a school would lose its Title IV eligibility, but the loss of eligibility only became effective the fiscal year <u>following</u> the non-compliant fiscal year (we note that the fiscal year ran from July 1 to June 30). <u>See</u> 34 C.F.R. § 600.40(a)(2)(1998). A non-complying school also could not become eligible to participate in Title IV again until it "demonstrate[d] compliance with all eligibility requirements for at least the fiscal year following the [non-compliant] fiscal year . . . ."[4] 34 C.F.R. § 600.5(g)(1999). The rule's enforcement was also retroactive, meaning that when the DOE made a final assessment of a school's noncompliance with the rule, with limited exceptions, the school would have to pay back any Title IV funds it received during any year it was ineligible. <u>See</u>

_____

[4] This rule has since been amended, and now requires the institution to fail compliance with the 90/10 rule for <u>two</u> years before it loses Title IV eligibility. <u>See</u> 34 C.F.R. § 668.28(c)(1)(2010).

- 6 -

id.; 34 C.F.R. § 668.26(d).  Therefore, if a school failed the 90/10 requirement in, say, the year that ran from July 1, 2004 through June 30, 2005, it was no longer Title IV-eligible as of July 1, 2005.  The school would also have to repay any Title IV funds it received from July 1, 2005 through June 30, 2006.  The regulations also relied on schools to self-report to the DOE any non-compliance with the 90/10 requirement.

Naturally, the DOE reviewed the audit reports the institutions submitted, after which the DOE prepared its own "final audit determination," or "FAD."  In a FAD, the DOE would notify an institution if it concluded that a school had violated any Title IV expenditure laws, and, if so, whether the school would be required to refund any Title IV funds it should not have received during a non-compliant year.  The institutions could appeal these final audit determinations to the agency by requesting an administrative hearing before an agency hearing officer.  If an institution was dissatisfied with the hearing officer's decision, it could then appeal to the DOE Secretary.

**International and Its Title IV Woes**

International was a for-profit community college based in Puerto Rico.[5]  The school operated four campuses on the island,

---

[5] We could not discern from the (voluminous) record exactly when International opened, but it appears the school existed since at least 1991.

- 7 -

offering non-degree programs (e.g., allied health, technology, and cosmetology) and associate degree programs. According to International, for a while, all of its educational programs qualified for Title IV funding (and, as will become apparent, much of the school's funding ended up coming from Title IV aid).[6] According to International, most of its students received Title IV grant funding to pay their tuitions.

In early May 2006, International submitted to the DOE its independent auditor's report for the fiscal year ending June 30, 2005, wherein the auditor certified that the school had received exactly 90 percent of its revenues from Title IV programs. But shortly after the audit was submitted, the DOE noticed in a footnote in the auditor's report that International had actually received 90.26 percent of its revenues from Title IV funds, and that the auditor had rounded the figure down to 90 percent. According to the DOE, this rounding practice was not permitted, and the DOE informed International of same in a letter dated May 8, 2006.

The letter also informed International that because it had exceeded the 90 percent threshold, it would be placed on "Heightened Cash Monitoring 2" funding, or "reimbursement

---

[6] It's also hard to tell from the record when all of International's programs became Title IV-certified, but we know that a number of them qualified since at least 1991.

funding," effective immediately, until the DOE could complete its full review of International's financials.[7]  This meant the school could no longer receive the usual upfront disbursement for its students' Title IV aid, and would instead have to make funding disbursements to students from its own cash, and then submit a reimbursement request.  According to International, it received "very few Title IV funds" from that point on; in fact, the school was only able to stay afloat through the fall semester because sometime between May and December 2006, one of its shareholders loaned the school $1.5 million to front the aid disbursements made to students.

Sometime in the next few months, the DOE completed its full review of International's Title IV eligibility, and in a letter dated November 8, 2006, notified International that because the school had not complied with the 90/10 rule during the fiscal year ending June 30, 2005 (i.e., fiscal 2005), and did not timely submit audits for either that year or the year prior, the DOE was denying the school's application to renew its Title IV participation for fiscal 2006.  Thus, according to the letter, International's Title IV eligibility lapsed on July 1, 2005 (the first day of fiscal 2006).  The letter also informed International

_____

[7] Since September 2002, the school was already on probationary Title IV eligibility status for a different violation (an issue with its past loan default rates).

that it could dispute the DOE's decision by demonstrating that the DOE's reasons for rejecting the recertification application were flawed.

International responded to the letter, but did not challenge the DOE's findings. In fact, International conceded that "its 2004 and 2005 audits were filed late, and that its fiscal 2005 Title IV revenue exceeded 90% of all of its relevant tuition revenue." Still, International asked the DOE to reconsider the decision not to renew the school's Title IV certification, and to adopt one of the several repayment plans International proposed; without Title IV aid, the school would have to close, International asserted.

The DOE declined, and in December 2006, informed International in another letter that it would not reconsider at that time its decision to deny the recertification application. The letter also stated that International would have to repay an estimated $1.4 million the school received during fiscal 2005 (the year it was Title IV-ineligible), and could not participate in Title IV again unless (and until) it not only repaid the liability, but also demonstrated that it "met the 90/10 Rule in a subsequent year." The letter reminded International that the DOE still had to "establish the exact amount of International's liability," so International was required to engage an auditor to conduct a

"closeout" audit of all the funds International had received up to July 1, 2006.

Apparently out of cash, the school closed in December 2006 (and, according to the DOE, without ever submitting a closeout audit). After a deal to sell the school fell through,[8] in August 2007, DOE made a final audit determination against International, concluding that International was not Title IV-eligible for the year ending June 30, 2006 for failing to comply with the 90/10 rule in the prior fiscal year. The DOE also determined that International was liable for the more than $1.3 million in Title IV funds that it received after July 1, 2005.[9]

### The Administrative Appeals

International appealed the FAD, and after a hearing, an administrative law judge affirmed the decision that International violated the 90/10 rule. The hearing officer concluded that 90.34 percent of International's fiscal 2005 revenues derived from Title IV sources. Relying on 34 C.F.R. § 600.5(d), the hearing officer determined that the school could not include as "revenue" in its 90/10 calculation the cash payments made by students "who take

---

[8] According to International, the buyer pulled out because the DOE took too long to assess the total amount of the liabilities International owed.

[9] Since International did not submit its fiscal 2005 audit until May 2006, and thus was not placed on Heightened Cash Monitoring until May 2006, the school had received upfront Title IV funds from July 1, 2005 to May 2006.

only one course at a time on a Saturday," as those students were not enrolled in a half- or full-time academic program.

International appealed the hearing officer's decision to the DOE Secretary, arguing that the officer's "interpretation of [34 C.F.R. § 600.5(d)(1)] is overly restrictive" because the regulation "permits an institution to include revenue from students taking courses in Title IV-eligible programs on a less than a [sic] half-time basis." The Secretary concluded that whether or not a student was enrolled in a Saturday course was irrelevant; rather, what mattered was whether the student was also enrolled in a Title-IV eligible program. The Secretary therefore remanded the case back to the hearing officer to conduct additional factfinding as to how many students at International were actually enrolled in a Title-IV eligible program.

On remand, the administrative judge affirmed again, finding that International presented "no convincing evidence" that the "Saturday-only students [were] enrolled in any Title IV-eligible programs."

International appealed (again) to the Secretary, and on this second appeal, raised an additional argument -- that even if the Secretary were to agree with the hearing officer that International violated the 90/10 rule, the Secretary should allow International to remedy the violation (and also forgive the $1.3

- 12 -

million liability), as he did in his recent decision concerning another school in a similar circumstance.[10]

This go-round, though, the Secretary affirmed, rendering the final audit determination a final agency action. While the Secretary questioned the adequacy of the hearing officer's factfinding, he nonetheless affirmed the 90/10 determination because International did not "straightforwardly challenge [the hearing officer's] fact-finding." The Secretary also declined to forgive International's liability, concluding that International's case was too distinguishable from the case it was relying on to request that remedy.[11]

**This Lawsuit**

Still dissatisfied, International brought an APA action in the Puerto Rico district court,[12] asking for a declaratory judgment that the DOE's final audit determination was arbitrary and capricious, as well as a stay on the DOE's enforcement of the

---

[10] International also made additional arguments that are not relevant to this appeal.

[11] The Secretary assumed without deciding that this issue, which wasn't raised on the first appeal to him, was properly preserved.

[12] The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

FAD.[13]  Specifically, International made the following relevant claims:  (1) the DOE Secretary acted arbitrarily and capriciously because he would not forgive International's 90/10 violation, even though he did forgive a "similarly situated" school's 90/10 violation; (2) the DOE's 90/10 determination against International was incorrect because the calculation improperly excluded the revenue from the students enrolled in the Saturday-only courses; and (3) the DOE should have allowed International to cure its 90/10 default.[14]

The case ensued, and International moved to compel the DOE to produce documentation of the policies and procedures leading to its decision, but a magistrate judge denied that request. Relying on the administrative record, the DOE then moved for summary judgment, asking the court to dismiss International's complaint.  International also moved for summary judgment in its favor.  The magistrate judge granted the DOE's motion and denied International's, thus dismissing the action.  Specifically, the

---

[13] An additional plaintiff, L'Image Educational Corp., was not involved in this matter, but because the DOE could impose International's liabilities on L'Image based on the companies' ownership structure, see 34 C.F.R. §§ 668.15(c)(2006), 668.174(b)(2002), it was named as a plaintiff in the suit.

[14] International also brought a fourth claim -- that the DOE acted arbitrarily and capriciously by taking too long to assess the school's total liabilities, thus prompting the anticipated buyer of the school to terminate the deal.  But International does not pursue this claim before us.

magistrate judge found that the Secretary's definition of "revenues" was reasonable; that the Secretary's affirmance of the FAD was not an abuse of discretion; and that the Secretary did not err in rejecting International's attempts to cure its 90/10 violation.

This timely appeal followed.

### STANDARD OF REVIEW

We review a trial court's grant of summary judgment <u>de novo</u>. <u>Morón-Barradas</u> v. <u>Dep't of Educ.</u>, 488 F.3d 472, 478 (1st Cir. 2007). But when reviewing an agency decision, "[b]ecause both the district court and this court are bound by the same standard of review, . . . our review . . . is . . . in effect, direct review of the [agency's] decision." <u>Atieh</u> v. <u>Riordan</u>, No. 14-1947, 2015 WL 4855786, at *2 (1st Cir. Aug. 14, 2015).

The summary judgment "rubric" also "has a special twist in the administrative law context." <u>Associated Fisheries of Me., Inc.</u> v. <u>Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997). When, as here, the governing statute "incorporates the familiar standard of review associated with the Administrative Procedure Act," "judicial review, even at the summary judgment stage, is narrow." <u>Id.</u> That is because "the APA standard affords great deference to agency decisionmaking," and "the Secretary's action is presumed valid." <u>Id.</u> Thus, "a court may set aside an administrative action only if that action is arbitrary, capricious, or otherwise contrary

- 15 -

to law." Id.; 5 U.S.C. § 706(2)(A). In other words, we "focus on whether the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Sistema Universitario Ana G. Mendez v. Riley, 234 F.3d 772, 777 (1st Cir. 2000) (citation and alterations omitted).

## DISCUSSION

International's appellate claims fall into three camps. First, International argues that the DOE regulations, as promulgated, wrongly interpreted the 90/10 rule because their definition of "revenues" was too narrow for purposes of calculating a school's 90/10 compliance. Even if the regulations were valid, International argues, the Secretary arbitrarily and capriciously applied them to International's case, and so the DOE's 90/10 assessment was improper. Second, International claims that even if the agency's 90/10 calculation were correct, the Secretary should have let International try to cure its default. And third, International argues that the magistrate judge erred by denying it the chance to conduct discovery.

We address each of International's arguments.

### A. The Secretary's 90/10 Calculations

As we noted above, International first argues that in promulgating the implementing regulations, the Secretary did not correctly interpret the 90/10 statutory provision, 20 U.S.C. §

- 16 -

1002(b)(1)(F)(2003).  We will delve into the particulars of International's claim in a little bit, but generally, International argues that the DOE regulations improperly excluded certain types of tuition revenue in the 90/10 calculus and that if the regulatory definition of "revenues" was not so narrow, International would have fallen below the 90 percent threshold.

As we mentioned above, Title IV requires that a proprietary institution ensure that "at least 10 percent of the school's revenues [come] from sources that are not derived from funds provided under [Title IV], as determined in accordance with regulations prescribed by the Secretary."  20 U.S.C. § 1002(b)(1)(F)(2003).  And the regulations "prescribed by the Secretary" provided that:

> An institution satisfies the [90/10] requirement . . . by examining its revenues under the following formula for its latest complete fiscal year:
>
> [Title IV] program funds the institution used to satisfy its students' tuition, fees, and other institutional charges to students
>
> [divided by]
>
> [t]he sum of revenues including [Title IV] program funds generated by the institution from: tuition, fees, and other institutional charges for students enrolled in [Title IV] eligible programs as defined in 34 CFR 668.8; and activities conducted by the institution, to the extent not included in tuition, fees, and other institutional charges, that are necessary for the education or training of its

- 17 -

> students who are enrolled in those eligible programs.

34 C.F.R. § 600.5(d)(1)(1999). In other words, according to the regulations, only the funds the school generated from students enrolled in Title IV programs (and not from the whole student body) could be used to calculate a school's total "revenues."

International argues that this regulation constitutes an erroneous interpretation of the term "revenues," as it was used in the Title IV statute, because "revenues," taking its ordinary meaning, "would include all non-title IV income received for tuition . . . regardless of its source." Specifically, International wanted the DOE to include the cash payments it received from the students enrolled in the individual Saturday courses, even if they were not necessarily enrolled in an academic program.

The Supreme Court's two-step framework, as laid out in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), directs our review of this claim. When reviewing an agency's interpretation of a federal statute, we first look to see if "Congress has directly spoken to the precise question at issue." Id. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43 (footnote omitted). "If, however,

- 18 -

the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." Id. at 843 (footnote omitted). "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [action] is based on a permissible construction of the statute." Id. And when Congress explicitly leaves "a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Id. at 843-44. These "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844.

In stating that "at least 10 percent of the school's revenues" had to come "from sources that are not derived from funds provided under [Title IV], as determined in accordance with regulations prescribed by the Secretary," 20 U.S.C. § 1002(b)(1)(F)(2003) (emphasis added), we construe the statute as specifically delegating to the agency the responsibility of defining "revenues". But International simply ignores the latter part of the statute, failing to argue why we should not read the statute this way. Left to our own devices, we see no reason why we should not (particularly because we do not see what purpose the

"as determined in accordance with regulations prescribed by the Secretary" language would otherwise have). See Corley v. United States, 556 U.S. 303, 314 (2009) (noting that statutes should be "construed so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant"). Thus, the relevant question here is whether the regulation's definition was "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844.

International does not directly address this part of the Chevron inquiry, but does (scantly) argue that the definition of "revenues" should have been more broad because Congress intended to "put pressure on schools like International to attract students willing to pay out of pocket for education based on the quality of education that school provides," and so "cash payments from students willing to pay out of pocket for individual courses certainly ties directly to Congress' intent to identify the quality of an institution's education by requiring that some of its tuition revenues come from sources other than the Title IV programs." But International, while proffering a potential alternative definition, does nothing to address the actual legal standard -- that is, whether the definition of "revenues" that the Secretary chose, and implemented via regulation, was unreasonable or

otherwise contrary to Congressional intent.[15]  Chevron, 467 U.S. at 845 ("If [an administrative interpretation] represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.").

International arguably waived this argument by failing to develop it.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Waiver aside, we think International's claim falters on the merits.  Clearly the statutory term "school's revenues" cannot mean literally all revenues of any type (such as, for example, donations, licensing fees, grants, etc.).  Given the need to draw a line, and Congress's aim to have institutions demonstrate a private market demand for the subsidized programs at proprietary institutions, the exclusion of tuition payments by persons picking and choosing only parts of the eligible Title IV programs rather than the actual program itself would seem to be within the

---

[15] International does direct us to some statements made by several Congressmen purportedly questioning whether the Secretary's definition of "revenues" was overly restrictive.  But, as International concedes, these statements were made after the statute was enacted.  As the Supreme Court has said, "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation . . . [because it] by definition could have had no effect on the congressional vote." Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011) (citation omitted).

boundaries of a non-arbitrary line that comports with the statute's intent.  See Career Coll. Ass'n v. Riley, 70 F.3d 637 at *2 (D.C. Cir. 1995) (per curiam) (unpublished) ("It is reasonable to infer . . . that when Congress added the 15% requirement it intended to ensure higher quality in the very programs it was subsidizing under that title, namely the eligible ones.").

### Application of the Regulations

Moving from the general to the specific, we next address International's claim that the DOE misapplied the 90/10 regulations in this case.  Despite the fact that International admitted early on in the administrative proceedings that it violated the 90/10 rule, International now insists that the DOE should have included in its calculations of International's total income the cash tuition payments the school received from students who were enrolled in the individual Saturday courses (even if the students were not necessarily enrolled in a degree or non-degree program), and that if the DOE had considered those payments, its revenues from non-Title IV sources would have exceeded 10 percent of the school's total income.

As we explained above, the Secretary's regulation defined a school's overall "revenues," in relevant part, as those funds deriving from "tuition . . . for students enrolled in eligible programs as defined in 34 C.F.R. § 668.8."  34 C.F.R. § 600.5(d)(1)(1999).  And 34 C.F.R. § 668.8 defined "eligible

- 22 -

programs" as those programs that required a certain minimum number of weeks and hours of instruction and prepared students for "gainful employment in a recognized occupation."  34 C.F.R. § 668.8(d)(1)(iii)(1987).[16]  Recognizing that an individual course did not meet the regulation's definition of an "eligible program," International nonetheless argues that because the courses were creditable toward a degree program, the income derived from them

---

[16] 34 C.F.R. § 668.8(d)(1987) provided:

An eligible program provided by a proprietary institution of higher education or postsecondary vocational institution—

(1)(i) Must require a minimum of 15 weeks of instruction, beginning on the first day of classes and ending on the last day of classes or examinations; (ii) Must be at least 600 clock hours, 16 semester or trimester hours, or 24 quarter hours; (iii) Must provide undergraduate training that prepares a student for gainful employment in a recognized occupation; and (iv) May admit as regular students persons who have not completed the equivalent of an associate degree;

(2) Must . . . (i) Require a minimum of 10 weeks of instruction, beginning on the first day of classes and ending on the last day of classes or examinations; (ii) Be at least 300 clock hours, 8 semester or trimester hours, or 12 quarter hours; (iii) Provide training that prepares a student for gainful employment in a recognized occupation; and (iv)(A) Be a graduate or professional program; or (B) Admit as regular students only persons who have completed the equivalent of an associate degree.

- 23 -

should have been included as "revenue." International argues that DOE precedent demands this conclusion.

The precedent International relies on is a single administrative decision, Sinclair Community College, U.S. Dep't of Educ., No. 89-21-S, 75 Educ. L. Rep. 1296 (May 31, 1991) (aff'd by the Sec'y, Sept. 26, 1991), where the DOE held that even if a student had not yet declared a major, her tuition payments would still be considered revenue for Title IV purposes if she was enrolled in an eligible program. To be sure, "[d]eparture from agency precedents embodied in prior adjudicative decisions can constitute an abuse of discretion if the reasons for the failure to follow precedent are not explained." River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 117 (1st Cir. 2009). But even if we assume, without deciding, that Sinclair has precedential value in this case,[17] Sinclair would not help International -- the school in Sinclair "verif[ied] that its students were enrolled in programs of study leading to a degree or certificate," and the students simply had not yet declared a major. Sinclair, 75 Educ. L. Rep. 1296. Here, International has not asserted that the students enrolled in the individual courses were "enrolled in programs of

_____

[17] An issue we need not address given our holding that Sinclair is inapposite, the DOE argues that Sinclair cannot be applied here at all because it actually predated the existence of the 90/10 rule, and so its holding could not have been intended to extend to application of the 90/10 regulations.

study leading to a degree or certificate," so we do not see how Sinclair is even persuasive -- a distinction certainly exists between students taking just one course and students who have already committed to a whole program. Given that International makes no other arguments as to how the DOE misapplied the regulations in determining that International had violated the 90/10 rule, we conclude that the Secretary did not abuse his discretion in this regard.

### B. International's Attempts to Cure

Next, International argues that the Secretary erred in rejecting its attempts to cure its 90/10 violation because one, the Title IV statute required the Secretary to give the school an opportunity to fix its mistake, and two, the Secretary's decision was inconsistent with his prior treatment of a similarly situated school, which he did allow to cure its 90/10 violation.

The DOE Secretary's 2009 decision in Gibson Barber & Beauty College provides the backdrop for this set of arguments. In 2005, the DOE issued a final audit determination against Mississippi-based Gibson Barber & Beauty College ("Gibson") for violating the 90/10 rule in fiscal 2002. See U.S. Dep't of Educ., No. 05-49-SA (Nov. 25, 2009). The DOE determined that the school had derived 92 percent of its revenue from Title IV sources (exceeding the 90 percent threshold by $3,850) and sought the

- 25 -

return of about $186,000 of Title IV funds the school had received the following year, fiscal 2003.  Id. at *2.

In appealing the FAD to a hearing officer, Gibson pointed out that because the school anticipated in 2002 that it would not comply with the 90/10 rule, that same year, the school's owner loaned the school $3,850 (which she later converted to a donation) with the purpose of making the school 90/10-compliant.  Id.  The hearing officer determined, however, that donations did not constitute an acceptable source of revenue, as defined by the regulations, and therefore, the school still had not complied with the 90/10 rule during the 2002 fiscal year.  Id. at *1-2.  Thus, the hearing officer concluded, Gibson was liable for the $186,000 it received in fiscal 2003.  Id.

Gibson appealed to the DOE Secretary.  Id.  The Secretary reversed the FAD, concluding that although the donation did not count as revenue, "requiring [Gibson] to repay $186,958 because [it] exceeded the 90/10 calculation by $3,850 is not in accord with [Gibson's] effort to execute corrective measures to bring the institution within compliance of the 90/10 rule."  Id. at *2.  The Secretary relied on 34 C.F.R. § 668.113(d),[18] which he interpreted

_____

[18] 34 C.F.R. § 668.113(d) (1998) provided:

> (1)  If an institution's violation that resulted in the final audit determination . . . results from an administrative, accounting, or recordkeeping error, and that error was not

- 26 -

as granting him the "authority to accept an institution's corrective measures in the administration of Title IV funds when in my judgment such measures 'eliminate the basis for the liability' sought by [the DOE] . . . ." Id. Specifically, the Secretary noted that Gibson exceeded the 90 percent threshold by only a "conspicuously small amount of money;" there was no evidence that Gibson had engaged in fraud or a pattern of similar violations; Gibson had no other regulatory infractions; and Gibson's attempted corrective measure (the $3,850 donation) would have brought the school in compliance had the donation been an acceptable source of revenue. Id. at *2-3.

Here, International urged the Secretary to take the same course as in Gibson, that is, to forgive the school's $1.3 million liability. But the Secretary rejected that argument, finding that International's case was too distinguishable from Gibson's, such that "[t]he scope of the equitable remedy authorized in [Gibson]

---

part of a pattern of error, and there is no evidence of fraud or misconduct related to the error, the Secretary permits the institution to correct or cure the error.

(2) If the institution is charged with a liability as a result of an error described in paragraph (d)(1) of this section, the institution cures or corrects that error with regard to that liability if the cure or correction eliminates the basis for the liability.

- 27 -

does not encompass the facts of" International's case. Specifically, the Secretary found that International's case was distinguishable from Gibson's because (1) International exceeded the 90 percent threshold by more than double the amount Gibson had, such that International's deficit was not "conspicuously small" like Gibson's was; (2) the DOE had already questioned International's ability to serve as a responsible fiduciary to the Title IV funds, illustrated by the fact that International had already been placed on Heightened Cash Monitoring; and (3) unlike Gibson, International did not establish that it had anticipated the 90/10 shortfall and then "corrected or cured the error that resulted in liability," in the same year that the violation occurred, and "in a manner that eliminates the basis of liability."

International argues that the Secretary's decision was erroneous in two respects. First, International claims that a statutory provision, 20 U.S.C. § 1099c-1(b)(3), on its face required the Secretary to allow the school to "cure its error absent a pattern of error and absent fraud or misconduct related to the error." And second, International argues that it did cure its 90/10 error by infusing cash into the school with the $1.5 million loan from the owner, similar to the tack Gibson took, such that its 90/10 violation also should have been forgiven.

First, we easily dispose of the claim that 20 U.S.C. § 1099c-1 required the Secretary to allow International to cure its

default. To be sure, § 1099c-1(b)(3) provided that "the Secretary <u>shall</u> . . . permit the institution to correct or cure an administrative, accounting, or recordkeeping error if the error is not part of a pattern of error and there is no evidence of fraud or misconduct related to the error." (Emphasis added). The implementing regulation provided, however, that "[i]f an institution's violation that resulted in the final audit determination . . . results from an administrative, accounting, or recordkeeping error, and that error was not part of a pattern of error, and there is no evidence of fraud or misconduct related to the error, the Secretary <u>permits</u> the institution to correct or cure the error." 34 C.F.R. § 668.113(d)(1) (1999) (emphasis added).[19] But International argues only that the "Secretary had a statutory duty to permit International to cure its error absent a pattern of error and absent fraud or misconduct related to the error." While International does not clearly argue such, we interpret this claim as one that the statute's use of mandatory language -- "shall" -- required the Secretary to let the school correct or cure its mistake, while the implementing regulation's use of discretionary language -- "permits" -- did not, thus

---

[19] Given the language in both the statute and the implementing regulation referencing administrative accounting or bookkeeping errors, we do not even see how these provisions would ever apply to a substantive 90/10 violation. We will assume without deciding, however, that the statute could apply to an actual 90/10 violation because the DOE does not make this argument.

rendering the regulation's interpretation of the statute erroneous. However, International provides no developed argument as to why the statute and regulation are inconsistent just because their language is not identical, such that the Secretary per se erred by relying on the regulation. See Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 432 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'"). This argument is therefore waived for lack of development. See Zannino, 895 F.2d at 17.

Next, International argues that even if the decision to permit the school to cure its 90/10 problem was solely the Secretary's discretionary call, he arbitrarily and capriciously applied 34 C.F.R. § 668.113(d) in a manner inconsistent with the standard set forth in his decision in Gibson. International claims that the distinctions the Secretary drew between Gibson and International were "strained" and "minor" because (1) like Gibson, International did not have any prior regulatory violations when the 90/10 assessment was imposed; (2) the amount by which both schools exceeded the 90 percent threshold was "de minimis"; and (3) International took the same corrective action Gibson took by making a donation to the school.

While not explicitly so, International's claim is framed as one that the Secretary arbitrarily departed from prior precedent

(i.e., the Gibson decision) in refusing to grant relief from International's 90/10 violation.[20]  And "[d]eparture from agency precedents embodied in prior adjudicative decisions can constitute an abuse of discretion if the reasons for the failure to follow precedent are not explained."  River St. Donuts, LLC, 558 F.3d at 117.

But International's claim stands on shaky footing. While an agency must "explain[] why change is reasonable" when it departs from prior agency precedent, Shaw's Supermarkets, Inc. v. NLRB, 884 F.2d 34, 41 (1st Cir. 1989), International has not argued, let alone established, that the holding set forth in Gibson reflected any "prior norm," "usual rule[] of decision," or "consistent precedent" of the DOE, see id. at 36-37 (internal quotation marks omitted), such that the Secretary was bound by the Gibson decision in first place.  See also River St. Donuts, 558 F.3d at 116 (noting the agency was departing from a "policy"). And we see Gibson, at best, as simply a case-specific application of 34 C.F.R. § 668.113(d) (and likely an incorrect one at that, from what we can tell).  Indeed, the Secretary specifically said in Gibson:

I do not hold as a general matter that

---

[20]  The magistrate judge also interpreted the nature of International's claim this way, and neither party took issue with this characterization in the briefing.

- 31 -

> violations of the 90/10 rule are to be considered administrative errors or that such violations are always subject to the extraordinary remedial exceptions of section 668.113(d). Rather, this decision stands for the limited proposition that under circumstances that I deem applicable, I may exercise my authority to accept a corrective action of an isolated regulatory violation . . . .

Gibson at *2 n.6. Thus, we do not see (and International has not shown) how Gibson reflected agency precedent, such that the Secretary was even required to explain his reasons for departing from that case in deciding this one.

Even if we assume, however, that the Secretary owed International an explanation, International's claim would still fail because the Secretary more than adequately explained why International's case was distinguishable from Gibson's.[21] As we have said before, "[t]he agency's actions are presumed to be valid," P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R., 665 F.3d 309, 319 (1st Cir. 2011), and so the Secretary's decision to depart from prior precedent need only be "supported by a rational basis," River St. Donuts, LLC, 558 F.3d at 117. Also, as the Secretary noted, the DOE already had concerns about whether

---

[21] As we noted above, the law would require the Secretary to "focus[] upon the issue and explain[] why change is reasonable," Shaw's Supermarkets, Inc. v. NLRB, 884 F.2d 34, 41 (1st Cir. 1989), but International doesn't argue that the Secretary did not focus on the issue.

International could operate as a responsible fiduciary (illustrated by the fact that the DOE had placed the school on Heightened Cash Monitoring), which was a concern that did not exist in the Gibson case.[22]  Further, International did not, as Gibson did, "adopt [] corrective measures that would eliminate the basis for liability."  While International compares the $1.5 million loan the school's owner made in 2006 to the $3,850 donation Gibson's owner made, as the Secretary notes, the Gibson donation was made during the infracting year, and specifically with the purpose of remedying the 90/10 violation.  The loan made to International, however, was not intended to cure the school's 90/10 violation -- it was made (well after the infracting fiscal year was over) to keep the school afloat as it paid out student funds from its own pocket while the school was on Heightened Cash Monitoring.  Thus, the Secretary concluded, the International loan could not have corrected International's basis for liability.  Based on these facts alone, the Secretary adequately explained why departure from the relief provided in Gibson was reasonable.

---

[22]  International argues that it was on Heightened Cash Monitoring only due to their 90/10 violation, and thus, being on Heightened Cash Monitoring is neither a regulatory violation in and of itself, nor indicative of other problems.  We note, however, that the DOE has discretion regarding when to place institutions on Heightened Cash Monitoring, 34 C.F.R. § 668.162(a)(1), and the school does not dispute that the reason International was placed on Heightened Cash Monitoring was because the DOE had concerns about its fiduciary capacity.

All in all, we conclude that the magistrate judge's summary judgment affirmance of the FAD was proper.

## C. Discovery

Finally, International argues that the magistrate judge should have permitted limited discovery to supplement the administrative record, namely, for the DOE to turn over all the documents it considered in reaching its decision against International. Specifically, International claims that the agency did not provide any of its "internal guidance, policies, procedures, or memoranda."

This argument has no merit. When reviewing agency decisions, we do not allow supplementation of the administrative record without specific evidence (i.e., a "strong showing") of the agency's "bad faith or improper behavior." Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1458-59 (1st Cir. 1992) ("Courts require a strong showing of bad faith or improper behavior before ordering the supplementation of the administrative record."); United States v. JG-24, Inc., 478 F.3d 28, 34 (1st Cir. 2007) ("Normally, we do not allow supplementation of the administrative record unless the proponent points to specific evidence that the agency acted in bad faith."). Here, International has not even suggested that the agency acted in bad faith, let alone provided evidence of it. Therefore, the magistrate judge did not err in denying the request for discovery.

## CONCLUSION

For these reasons, we **affirm** both the grant of the DOE's motion for summary judgment and the denial of International's motion for summary judgment.  We likewise **affirm** the denial of the motion to compel.