# United States Court of Appeals

## For the First Circuit

No. 23-1969

UNITED STATES

Plaintiff, Appellee,

DEPARTMENT OF NATURAL RESOURCES OF THE COMMONWEALTH OF PUERTO RICO,

Plaintiff,

v.

ERNST JACOB GMBH & CO. KG; SHIPOWNERS INSURANCE & GUARANTY COMPANY, LTD.,

Defendants, Third-Party Plaintiffs, Appellants,

MARGARA SHIPPING LTD.; STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LTD.,

Third-Party Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gina R. Méndez-Miró, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

Keith Bradley, with whom ScheLeese Goudy, David Indiano,
Indiano & Williams, P.S.C., Eugene J. O'Connor, Robert O'Connor,
Montgomery McCracken, Kayla Marie Mendez, Squire Patton Boggs LLP,
Manuel San Juan, Law Offices of Manuel San Juan, Robert B. Parrish,
Thomas C. Sullivan, Moseley, Prichard, Parrish, Knight & Jones,

and <u>Richard L. Jarashow</u>, were on brief for appellants.

<u>Jospeh G. Grasso</u>, <u>Evan Bianchi</u>, and <u>Wiggin and Dana LLP</u>, on brief for American Institute of Marine Underwriters as amicus curiae supporting appellants.

<u>Allen M. Brabender</u>, with whom <u>Todd Kim</u>, Assistant Attorney General, <u>Elias L. Quinn</u>, and <u>Natalie G. Harrison</u>, were on brief, for appellee.

October 23, 2025

**Barron**, <u>Chief Judge</u>.  In this interlocutory appeal, we confront a challenge to a grant of summary judgment to the United States as to the issue of liability on its claims for damages under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701-2761.  The claims name as defendants the owner and the insurer of an oil tanker that ran aground on the coast of Puerto Rico.  We conclude that we have appellate jurisdiction under 28 U.S.C. § 1292(a)(3) because this case "includes an admiralty . . . claim."  Fed. R. Civ. P. 9(h)(2).  We further conclude, with respect to the appeal's merits, that the defendants are right that the District Court erred in granting summary judgment to the United States as to the issue of liability.  Accordingly, we vacate the District Court's decision in part, reverse the District Court's grant of partial summary judgment, and remand for further proceedings consistent with this opinion.

## I.

In December 2021, the United States filed a complaint against Ernst Jacob GmbH & Co. KG ("Ernst Jacob") and Shipowners Insurance & Guaranty Company, Ltd. ("SIGCo") in the District of Puerto Rico.  To properly frame the issues on appeal, we first need to describe the relevant aspects of OPA.  We then will review the travel of the case.

- 3 -

**A.**

In response to the Exxon Valdez oil spill off the coast of Alaska in 1989, Congress enacted OPA "to promote the prompt cleanup of oil spills," CITGO Asphalt Refin. Co. v. Frescati Shipping Co., 589 U.S. 348, 353 (2020), and to "establish[] a comprehensive federal scheme for oil pollution liability," S. Port Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 64 (1st Cir. 2000). Although this appeal primarily implicates OPA's scheme for oil pollution liability, it helps to first begin with the provisions of OPA that aim to promote the prompt cleanup of oil spills by authorizing the United States to take certain response actions in the event of an "incident," 33 U.S.C. § 2702(a), as some of those provisions also feature in arguments that we must address.

The statute defines an "incident" to include an "occurrence" that involves a "vessel[]" and that "result[s] in the discharge or substantial threat of [a] discharge of oil." Id. § 2701(14). In the event of an "incident," OPA provides that "[t]he President shall, in accordance with the National Contingency Plan . . . ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil." Id. § 1321(c)(1)(A).

The National Contingency Plan ("NCP"), to which OPA refers, is the Oil and Hazardous Substances Pollution Contingency

- 4 -

Plan. See id. §§ 1321(d) (authorizing the NCP), 2701(19) (defining the NCP); 40 C.F.R. § 300 (setting forth the NCP). The U.S. Environmental Protection Agency ("EPA") promulgates the NCP, which authorizes "[t]he Administrator of EPA or the Secretary of the department in which the [U.S. Coast Guard] is operating . . . to initiate . . . appropriate response activities when the Administrator or Secretary determines that" there is a "discharge[]" or "a substantial threat of such discharge from any vessel" into the waters of the United States. 40 C.F.R. § 300.130(b). The NCP requires that the U.S. Coast Guard designate a federal on-scene coordinator ("FOSC") for response efforts for actual or threatened oil discharges. See id. §§ 300.120(a) (providing general FOSC responsibilities), 300.130(b) (providing for responsibilities in the event of an incident), 300.5 (defining FOSC).

Under the NCP, "[t]he basic framework for the response management structure is a system (e.g., a unified command system) . . . where the [F]OSC maintains authority." Id. § 300.105(d). The U.S. Coast Guard's "Technical Operating Procedures for Determining Removal Costs" in effect at the time of the grounding of the vessel in this case provides that "[e]ach FOSC has the authority to determine whether particular situations present substantial threats of discharge." U.S. Coast Guard, Nat'l Pollution Funds Ctr., NPFCINST M7300.1, ch.7, sec. B, Technical

<u>Operating Procedures for Determining Removal Costs under the Oil
Pollution Act of 1990</u> (June 1999).

With respect to establishing the liability of "each
responsible party," OPA provides that such parties are liable not
only for "removal costs" but also for "damages" that "result from"
an "incident." 33 U.S.C. § 2702(a). OPA defines "removal costs"
to include the "costs incurred by the United States, a State, or
an Indian tribe," <u>id.</u> § 2702(b)(1), "to prevent, minimize, or
mitigate oil pollution from [] an incident," <u>id.</u> § 2701(31). It
defines "damages" to include "damages" to "natural resources,"
"real or personal property," "subsistence use," "revenues,"
"profits and earning capacity," and "public services." <u>Id.</u>
§ 2702(b)(2). And it defines "responsible party" to include "[i]n
the case of a vessel, any person owning, operating, . . . or demise
chartering," <u>id.</u> § 2701(32), the vessel that is the source of the
discharge or substantial threat of a discharge of oil, <u>id.</u>
§ 2702(a). The guarantor of the vessel is likewise liable. <u>See</u>
<u>id.</u> § 2716(f)(1).

Damages to "natural resources" are defined as "[d]amages
for injury to, destruction of, loss of, or loss of use of, natural
resources, including the reasonable costs of assessing the
damage." <u>Id.</u> § 2702(b)(2)(A). "Natural resources" are defined as
"land, fish, wildlife, biota, air, water, ground water, drinking
water supplies, and other such resources." <u>Id.</u> § 2701(20).

- 6 -

Natural resource damages include the costs incurred to restore natural resources that have been injured in an incident, the diminution in value of the natural resources pending their restoration, "plus" the reasonable cost of assessing those damages. Id. § 2706(d)(1). Double recovery is not permitted. Id. § 2706(d)(3).

"In the case of natural resource damages," OPA provides that the "liability" of the responsible parties "shall be," id. § 2706(a), "to the United States Government for natural resources belonging to, managed by, controlled by, or appertaining to the United States," id. § 2706(a)(1). In contrast, OPA provides that the "liability" of the responsible parties for "natural resource damages" "shall be," id. § 2706(a), "to any State for natural resources belonging to, managed by, controlled by, or appertaining to such State or political subdivision thereof," id. § 2706(a)(2). "State," for purposes of OPA, includes Puerto Rico. Id. § 2701(36).

With respect to bringing a claim for "natural resource damages" under § 2706(a), OPA provides that "[t]he President shall designate" federal trustees for "natural resources" of the United States and that the governor of each state shall do the same for "natural resources" of their state. Id. § 2706(b)(2)-(3). OPA provides that the designated trustees "shall act on behalf of the public . . . as trustee[s] of natural resources to present a claim

- 7 -

for and to recover damages to the natural resources." Id. § 2706(b)(1).

The NCP designates various federal agencies as the federal trustees for different classes of "natural resources" that are "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled . . . by the United States." 40 C.F.R. § 300.600(a)-(b). The NCP designates National Oceanographic and Atmospheric Administration ("NOAA") as a United States trustee for the specific class of natural resources "in, under, or using waters navigable by deep draft vessels," see id. § 300.600(b)(1), that are "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled . . . by the United States, id. § 300.600(a).

The federal and state trustees, OPA provides, each "shall assess natural resource damages . . . for the natural resources under their trusteeship." 33 U.S.C. § 2706(c)(1)-(2). Additionally, federal and state trustees each "shall develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship." Id.

The NCP addresses the circumstance in which "there are multiple trustees, because of coexisting or contiguous natural resources or concurrent jurisdictions." 40 C.F.R. § 300.615(a). In that event, the NCP provides that the trustees "should

coordinate and cooperate in carrying out these responsibilities." Id.

There is one last set of statutory and regulatory provisions that also is worth mentioning. This set of provisions includes those provisions that pertain to the Oil Spill Liability Trust Fund (the "Fund").

The Fund is established by 26 U.S.C. § 9509. The U.S. Coast Guard's National Pollution Funds Center ("NPFC") manages the Fund, see 33 C.F.R. §§ 136.3, 136.5(b), which "works like an insurance pool." Savage Servs. Corp. v. United States, 25 F.4th 925, 931-932 (11th Cir. 2022). The Fund can be used to finance response efforts, reimburse responsible parties that make payments for which they are ultimately not liable, and pay for certain damages that would otherwise go uncompensated. Id.

Federal and state authorities may seek financing from the Fund to cover removal costs determined by the President to be consistent with the NCP. See 33 U.S.C. § 2712(a)(1)-(4). Additionally, the Fund may "pay[] claimants, including spill responders, under certain circumstances when they are not paid by the responsible party," D&B Boat Rentals, Inc. v. United States, 508 F. Supp. 3d 87, 91 (E.D. La. 2020), for "damages" resulting from a discharge or a substantial threat of a discharge of oil, 33 U.S.C. § 2712(a)(4). See id. § 2713; 33 C.F.R. § 136.103.

Generally, a party seeking compensation from the Fund must first demand payment from the responsible party. See 33 U.S.C. § 2713(a). If the demand is denied or not resolved within 90 days, then the party may present the claim for payment to the Fund. See id. § 2713(c); 33 C.F.R. § 136.103(c). When the Fund makes a payment to a claimant, the NPFC is "subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).

At the request of the "Secretary of the department in which the Coast Guard is operating," id. § 2701(33), "the Attorney General shall commence an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant," id. § 2715(c). "Such an action may be commenced against any responsible party . . . who is liable . . . to the compensated claimant or to the Fund, for the cost or damages for which the compensation was paid." Id.

**B.**

Turning back to the case before us, the operative complaint alleges as follows. In April 2006, the T/V Margara -- a 748-foot double-hulled tanker carrying more than 300,000 barrels of oil -- ran aground about three miles off the coast of Tallaboa, Puerto Rico. At all relevant times, Ernst Jacob owned or operated

- 10 -

the T/V Margara, and SIGCo acted as an insurer with respect to the vessel.

The crew of the T/V Margara notified the U.S. Coast Guard of its grounding after failing to free it.  The pre-designated FOSC, Captain James Tunstall of the U.S. Coast Guard, began overseeing response efforts as the FOSC.

The U.S. Coast Guard responded to the grounding by "deploying booms to contain oil in the event of a spill and overseeing the safe return of the vessel to deeper waters."  No oil was spilled, and the underwater hull survey revealed only cosmetic damage.  However, the "response efforts necessary to free the vessel and mitigate the risk of an oil spill resulted in the destruction or destabilization of nearly 7,000 square meters of coral reef."

The parties disagree about whether the record establishes that Tunstall -- the FOSC -- determined that the grounding posed a "substantial threat of a discharge of oil" within the meaning of 33 U.S.C. § 2702(a).  The United States contends that it does.  The defendants argue otherwise.

After the grounding, NOAA and the Puerto Rico Department of Natural and Environmental Resources ("PRDNER")[1] worked together

---

[1] The parties refer to this agency variously as the Puerto Rico Department of Natural and Environmental Resources and the Puerto Rico Department of Environmental and Natural Resources.

- 11 -

"to identify and perform emergency restoration and to undertake natural resource damage assessment for several years." At times, they worked cooperatively with Ernst Jacob to do so.

In April 2015, NOAA and PRDNER published the "Final Primary Restoration Plan and Environmental Assessment for the 2006 T/V Margara Grounding, Guayanilla, Puerto Rico." This plan included a natural resource damages assessment and a proposed approach to restore the damaged natural resources, which were identified as "coral resources, other reef biota, and reef habitat over a large area."

This plan "was only the first phase of a complete accounting for natural resource damages resulting from the T/V Margara incident." NOAA and PRDNER indicated that a future plan would propose "additional restoration."

In July 2016, NOAA and PRDNER "presented the claim for primary restoration costs to [Independent Maritime Consulting]," one of Ernst Jacob's representatives, "and Norwegian Hull Club," one of Ernst Jacob's insurers. NOAA and PRDNER "did not receive a reply."

In April 2017, NOAA and PRDNER "presented the claim for primary restoration costs to Pierson and Burnett, LLP, the authorized agent listed on the [T/V Margara's] Certificate of Financial Responsibility, but the package was returned as undeliverable." That same month, NOAA and PRDNER presented the

claim to SIGCo, which was "the guarantor listed on the T/V Margara's Certificate of Financial Responsibility." SIGCo declined to pay in July 2017.

NOAA, on behalf of itself and PRDNER, then presented a claim to the NPFC to seek compensation from the Fund. See 33 U.S.C. §§ 2712(a)(4), 2715. The NPFC deemed the Primary Restoration Project "reasonable and appropriate under OPA."

The NPFC issued a "Final Reconsidered Claim Determination" around May 30, 2019, that "award[ed] $4,403,590.98 in compensation for primary restoration efforts and authoriz[ed] $794,183.46 in contingency funds." The NPFC issued the compensation for primary restoration efforts in August 2019, and it paid out the previously authorized contingency funds in May 2021. "The NPFC incurred $54,776.50 in costs associated with" processing this claim.

On December 9, 2021, NOAA and PRDNER finalized and released their natural resource damages assessment. This assessment proposed "directly replac[ing] lost coral resources and restor[ing] degraded and impacted coral reefs." The estimated cost to implement this plan was $29,397,476.

NOAA also incurred assessment costs -- that is, costs incurred while assessing natural resource damages -- of $1,847,195.09. In October 2009, Independent Maritime Consulting, on behalf of Ernst Jacob, paid NOAA $433,352.49. Crediting the

- 13 -

payment, NOAA's alleged unrecovered assessment costs now stand at $1,413,842.60. NOAA and PRDNER "presented the claim for compensatory restoration costs and outstanding assessment costs to SIGCo and Ernst Jacob" the day that the assessment was finalized.

On the same day that NOAA and PRDNER finalized and released their natural resource damages assessment, December 9, 2021, the United States filed a complaint against the defendants in the District of Puerto Rico. The United States did so on behalf of NPFC for its subrogated claim under § 2702(a) for damages to natural resources arising from the Fund's payments to NOAA. See 33 U.S.C. § 2715(a) (providing that when a claimant receives compensation from the Fund, the NPFC becomes subrogated to the claimant's rights against responsible parties); id. § 2715(c).

Then, on March 25, 2022, the United States filed an amended complaint (the "Complaint"). It included the NPFC's subrogated claim and incorporated "NOAA's final claim for natural resource damages and NOAA's outstanding assessment costs."

The first claim sought relief for damages that had been compensated by the Fund; the second claim sought "uncompensated damages." Each claim alleged that SIGCo and Ernst Jacob were liable under § 2702(a) for the cost of restoring the "natural resources" that were injured in the grounding.

- 14 -

For relief, the United States requested that the District Court:

> (A) Enter a declaratory judgement against [the] [d]efendants . . . for all uncompensated damages for injury to . . . natural resources resulting from [the grounding of] the T/V Margara . . .;
> (B) Award [the] [p]laintiff, on behalf of the Fund, a judgement against [the] [d]efendants for all compensation paid by the Fund to Trustees for natural resource damages related to the T/V Margara incident, and all costs incurred by the Fund by reason of those claims . . .;
> (C) Award [the] [p]laintiff, on behalf of NOAA, a judgment against [the] [d]efendants for all natural resource damages assessed in the Trustees' Final Compensatory Restoration Plan and NOAA's uncompensated assessment costs[;] and
> (D) Award such other and further relief as the Court deems appropriate.

The parties discussed settlement for much of the next year. During that time, PRDNER intervened with its own claims under OPA and Puerto Rico law, but those claims are not at issue in this appeal.

The defendants also filed third-party complaints for subrogation or contribution against another of the ship's owners, Margara Shipping, Ltd. ("Margara Shipping"), as well as another of the ship's insurers, Steamship Mutual Underwriting Association, Ltd. ("Steamship"). The parties agree that these third-party claims -- unlike the United States's claims under § 2702(a) -- were brought in admiralty.

- 15 -

In September 2022, the parties held a status conference. The parties then issued the Joint Proposed Scheduling Plan (the "Plan"). They agreed in the Plan that "this case is appropriate for bifurcation into at least two phases for litigation," the first to consider liability and the second, if necessary, to resolve damages.

Notably, the Plan stated that the parties "disagree[d] as to whether further fact discovery is necessary for resolution of the liability phase of th[e] case." Although discovery had not yet taken place, the United States contended that no discovery was needed to resolve the issue of the defendants' liability as to the § 2702(a) claims.

The United States indicated that it "anticipate[d] filing a Motion for Partial Summary Judgment in the very near future." The United States also asserted that "the factual record is already thoroughly developed" and that "[i]ndeed, the sole remaining liability question is a matter committed to the discretion of the Coast Guard's On-Scene Coordinator." The United States recommended staying discovery deadlines pending resolution of the anticipated Motion for Partial Summary Judgment.

The defendants countered that "[t]here is no factual 'record' developed" and that "the record before th[e] court is devoid of any evidence." The defendants continued, contending that "[u]nless and until [the] [d]efendants have been able to

- 16 -

conduct discovery, there will be no proper record upon which [the District Court] might premise a ruling" on the then-unfiled motion.

Within one week of the status conference, the United States moved for partial summary judgment on the issue of liability. It argued that "[u]nder [OPA], each owner, operator, and guarantor for a vessel that poses a substantial threat of discharge of oil into navigable waters is liable for the incident's damages to natural resources." (Citing 33 U.S.C. § 2702(a), (b)(2)(A).) It contended that each of the defendants qualified as an "owner, operator [or] guarantor" for the T/V Margara, which itself qualified as a "vessel" under the act.

Thus, according to the United States, "[t]he only element of liability presently contested is whether a tanker carrying more than 300,000 barrels of No. 6 fuel oil stranded on a reef posed a substantial threat of a discharge of oil." In support of this contention, the United States asserted that the parties did not dispute that Ernst Jacob was an operator and SIGCo a guarantor of the ship involved in the grounding, "that the T/V Margara is a vessel under OPA, or that the incident occurred in the navigable waters of the United States . . . [or] that at least some reefs were damaged by the response."

In addition, the United States argued that "whether an incident posed a substantial threat of discharge is a determination Congress delegated to emergency response personnel and the

[FOSC]." And, thus, according to the United States, the FOSC's "decision . . . should be overturned only upon a showing [that] it was arbitrary or capricious." That was so, the United States contended, because that standard of review was the applicable one for this type of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C § 706(2)(A).

The United States attached to its Motion for Partial Summary Judgment a declaration from Tunstall, the Retired U.S. Coast Guard Captain who served as the FOSC for the grounding. In that declaration, Tunstall indicated that he "completed a real-time risk assessment of the situation[] and determined that there was a substantial threat of an oil discharge from the [T/V Margara]." The United States argued on that basis that Tunstall made a "substantial threat" determination and that, given the facts of the grounding, the determination was not arbitrary or capricious. The United States further argued that discovery was unnecessary because the District Court's review would be "confined to the administrative record."

In response, the defendants filed their Joint Opposition to Plaintiff's Motion for Partial Summary Judgment. They argued that the United States's motion for partial summary judgment should be denied because: (1) the United States had no right under § 2702(a) to sue for damages to these natural resources because the natural resources are not "belonging to, managed by, controlled

by, or appertaining to" the United States; (2) the defendants' "liability does not turn on a deferential APA review of [the FOSC's determination]," given that "none of the[] conditions" for "conventional [APA] review" are met here and "APA-type analysis" is "not import[ed] . . . into questions of liability, as the government wants"; (3) "even if the government were correct that liability turns on [APA] review of a determination by the [FOSC], that review would have to consider the 'full administrative record,'" which was not provided here; (4) "even if the government were correct that an FOSC determination of substantial threat is dispositive, there is at minimum a genuine dispute whether such determination was made in this case"; and (5) even if APA-review applies and "there had been a determination of a substantial threat, it would not survive judicial review."

On September 7, 2023, the District Court granted the United States's motion for partial summary judgment. The key issue, the District Court determined, was whether there was a genuine issue of material fact as to whether the vessel posed a "substantial threat" of a discharge of oil, such that the grounding of it constituted an "incident" for purposes of § 2702(a).

The District Court reasoned that "the authority to make a 'substantial threat' determination was clearly delegated to an agent of the United States, namely, a predesignated Coast Guard FOSC." It then concluded that, because the record established

- 19 -

beyond dispute that the FOSC here did make that determination, it had to review that determination in resolving whether there was a genuine issue of material fact as to the "substantial threat" issue. It further concluded that because this determination by the FOSC qualified as "an informal agency action," it had to review the determination under the APA's arbitrary-or-capricious standard based on the administrative record. Finally, it concluded based on that record that the FOCS's determination was not arbitrary and capricious and, thus, defendants, as a matter of law, were liable to the United States for "natural resource damages" under § 2702(a).

In granting partial summary judgment to the United States as to the defendants' liability, the District Court did not explicitly address the defendants' arguments that they were not liable to the United States for the alleged "damages" because the natural resources at issue were not "belonging to, managed by, controlled by, or appertaining to" the United States. See 33 U.S.C. § 2706. Nor did the District Court expressly hold that the "natural resources" involved were of that kind.

The defendants timely appealed.

## II.

We begin with the question of whether we have appellate jurisdiction. Ordinarily, we have it only over "'final decisions'

- 20 -

of the district court," Amyndas Pharms., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 27 (1st Cir. 2022) (quoting 28 U.S.C. § 1291), which generally are decisions that "end[] the litigation on the merits and leave[] nothing for the court to do but execute the judgment," Catlin v. United States, 324 U.S. 229, 233 (1945). Here, because the question of damages remains pending below, we have no such final decision. See P.R. Ports Auth. v. BARGE KATY-B, 427 F.3d 93, 100 (1st Cir. 2005).

Nonetheless, 28 U.S.C. § 1292(a)(3) gives us appellate jurisdiction over "[i]nterlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a)(3) (emphasis added). "The purpose of § 1292(a)(3)," we have explained, "[is] to permit a party found liable to take an immediate appeal from that [liability phase] finding and thereby possibly avoid an oftentimes costly and protracted trial of the damage issues." Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel, 833 F.2d 1059, 1063 (1st Cir. 1987) (second alteration in original) (quoting 9 Moore's Federal Practice, ¶ 110.19[3] at 210 (1985)). Moreover, Federal Rule of Civil Procedure 9(h)(2) provides that "[a] case that includes an admiralty or maritime claim within this subdivision (h) is an admiralty case within 28 U.S.C. § 1292(a)(3)."

The question, then, is whether we have appellate jurisdiction under 28 U.S.C. § 1292(a)(3) even though we lack it under 28 U.S.C. § 1291. The United States contends that we do not and that we therefore must dismiss the defendants' interlocutory appeal. Reviewing de novo, United States v. Santiago-Colón, 917 F.3d 43, 49 (1st Cir. 2019), we disagree.

**A.**

After the United States brought its § 2702(a) claims against the defendants, the defendants brought claims against two third parties -- Margara Shipping and Steamship. The parties to the appeal agree that these third-party claims were brought under admiralty law. Thus, this "case includes an admiralty . . . claim" so long as it "includes" these third-party claims. The United States argues, however, that this "case" does not include those claims and so does not "include" an "admiralty . . . claim," as the other claims in the case are not themselves admiralty claims. We disagree.

**1.**

In arguing that the third-party claims are not "include[d]" in "this case," the United States first relies on the test that the Supreme Court of the United States set forth in United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966). That test is the one that is used to determine when there is

- 22 -

supplemental jurisdiction under 28 U.S.C. § 1367 over a state law claim in a case arising under federal law.

Under the Gibbs test, the relationship between the federal and state claims must be "such that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding." Id. at 725. The United States argues that the third-party claims here cannot satisfy this test "[b]ecause the third-party claims ripen only on entry of final judgment." It therefore contends that the third-party claims are not "part of the same 'case'" for purposes of 28 U.S.C. § 1292(a)(3).

For present purposes, we need not decide whether the Gibbs test, which determines the scope of 28 U.S.C. § 1367, bears on the application of 28 U.S.C. § 1292(a)(3), such that a claim is included in a "case" for purposes of that provision only if the plaintiff "would ordinarily be expected to try [the admiralty claim and the claim at issue on appeal] in one judicial proceeding," Gibbs, 383 U.S. at 725. Even accepting the relevance of the Gibbs test to 28 U.S.C. § 1292(a)(3), we are not persuaded by the United States's argument.

It is well-settled that supplemental jurisdiction may extend to a third-party indemnity claim that ripens only after judgment. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 376 (1978) ("[T]he impleader by a defendant of a third-party defendant always is [ancillary to the federal claim]. A

third-party complaint depends at least in part upon the resolution of the primary lawsuit. Its relation to the original complaint is thus not mere factual similarity but logical dependence." (emphasis added) (citation omitted)); Bank of India v. Trendi Sportswear, Inc., 239 F.3d 428, 436-37 (2d Cir. 2000) ("It is well-settled that a third-party action for indemnification comes within a court's ancillary jurisdiction."). Indeed, we have held that a judgment must ordinarily resolve any outstanding third-party claims to be appealable as a final judgment in a case, even if all the first-party claims and counterclaims have been resolved. See Clausen v. Sea-3, Inc., 21 F.3d 1181, 1186 (1st Cir. 1994) (holding that a judgment must generally resolve third-party claims to be final and noting that a judgment that does not resolve all third-party claims "d[oes] not dispose of all the claims in the case" (emphasis added)). As a result, the Gibbs test provides no basis for concluding that this case includes no admiralty claims and so is not an admiralty case.

**2.**

The United States's seemingly related argument is that our "interlocutory appellate jurisdiction" under § 1292(a)(3) "cannot be so expansive as to include" the United States's claims for "natural resource damages" under § 2702(a) of OPA in this case because those claims and the admiralty claims -- the third-party

- 24 -

claims -- are not "integrally linked." The United States derives this "integrally linked" requirement from Roco Carriers, Ltd. v. M/V Nurnberg Express, 899 F.2d 1292 (2d Cir. 1990).

In that case, the Second Circuit characterized a non-admiralty claim as "integrally linked" to admiralty claims in holding that the non-admiralty claims were "part of the admiralty case" for purposes of § 1292(a)(3). Id. at 1297. But Roco Carriers does not indicate that a non-admiralty claim must be "integrally linked" to an admiralty claim for a non-final order resolving the non-admiralty claim to be appealable under § 1292(a)(3). And the defendants provide no support other than Rocco for our applying their "integrally linked" test here. Accordingly, we see no reason to read into § 1292(a)(3) a requirement that the claim on appeal be "integrally linked" to an admiralty claim in the case for a non-final order adjudicating that claim to be appealable.

### 3.

The United States further argues that "[w]hether a case is an admiralty case turns on whether the plaintiff properly designated the action as an admiralty case." Doyle v. Huntress, Inc., 419 F.3d 3, 7 (1st Cir. 2005) (emphasis added) (quoting Wingerter v. Chester Quarry Co., 185 F.3d 657, 664 (7th Cir. 1998)). The United States then contends that this case is not an

admiralty case because the only claims asserted to be admiralty claims are the third-party claims.

The defendants correctly point out, however, that in Doyle, the panel had no occasion to address whether an admiralty claim brought by a party other than the original plaintiff could make the case an "admiralty case" for purposes of § 1292(a)(3). In Doyle, there were no third-party admiralty claims at issue on appeal. Indeed, there were no third-party claims at issue at all in that case. So, we do not read the reference in Doyle to "whether the plaintiff properly designated the action as an admiralty case" to support the United States's position. We read that reference to stand only for the more modest proposition that, insofar as a plaintiff's claim supplies the basis for the case qualifying as an admiralty case, the claim must have been "properly designated" by the plaintiff as an admiralty claim.

**4.**

The United States also relies on an out-of-circuit precedent -- Poincon v. Offshore Marine Contractors, Inc., 9 F.4th 289 (5th Cir. 2021) -- to support its position that, because only a plaintiff may designate a "case" as an "admiralty case," this case is not such a case. There, the Fifth Circuit, according to the United States here, held that "third-party maritime claims and

[the] filing of [an] interlocutory appeal cannot alter [a] plaintiff's [non-admiralty] designation." See id. at 295.

Some portions of Poincon could be read to suggest that the plaintiff and only the plaintiff determines whether a case is an admiralty case. See id. ("The fact that Offshore Marine brought a maritime third-party claim against REC for contribution to Poincon's maintenance and cure does not change [that this is a civil case]. . . . [T]he decision whether to proceed in admiralty belongs to Poincon as the plaintiff."). But Poincon is not as strongly supportive of the United States's position as the United States contends.

For one thing, it not clear that the third-party claim in that case was, in fact, designated as an admiralty claim under Rule 9(h). In explaining why the third-party claim there "d[id] not change th[e] result," Poincon emphasized that the third-party claim "can be brought on the civil side of the federal courts." 9 F.4th at 295. Nothing in the decision, however, indicates that the third-party claim was brought as an admiralty claim. See id. at 293-96. Indeed, the appellee brief submitted in that case forcefully contends that the third-party claim was not so designated, see Letter Brief for Appellee at 2, Poincon v. Offshore Marine Contractors, Inc., 9 F.4th 289 (5th Cir. 2021) (No. 20-30765), and there appears to be no ruling on whether it was.

Here, of course, there is no dispute over whether the third-party claims at issue -- those brought by the defendants against Margara Shipping and Steamship -- were designated in admiralty. Those claims plainly were.

Additionally, Poincon repeatedly states that the "appeal" (as opposed to a third-party admiralty claim) cannot re-designate the case. 9 F.4th at 295. For example, Poincon indicated that "simply [] seeking an interlocutory appeal under § 1292(a)(3)" cannot "re-designate a case as an admiralty case" and that "[defendant]'s appeal does not undermine [plaintiff]'s election" to proceed in law rather than admiralty. Id. (emphasis added).

In this case, however, the defendants do not argue that "the appeal" designated the case as sounding in admiralty. They contend that the case is an admiralty case for purposes of § 1292(a)(3) because one of their third-party claims -- filed prior to this appeal -- invoked admiralty jurisdiction.

Finally, there is at least some authority in the Fifth Circuit to suggest that the choice of whether to proceed in admiralty does not always belong to the original plaintiff, as the United States argues Poincon holds. In an earlier Fifth Circuit decision, Noble Drilling, Inc. v. Davis, the court exercised appellate jurisdiction under 28 U.S.C. § 1292(a)(3) over an interlocutory appeal for which the only basis for admiralty

designation was the defendant's counterclaim.  See 64 F.3d 191, 194-95 (5th Cir. 1995).

In any event, we decline to follow Poincon to the extent that it may be understood to hold that a properly designated third-party claim cannot make a case an "admiralty case."  We see no basis in the text of Rule 9(h)(2) or 28 U.S.C. § 1292(a)(3) for differentiating between a counterclaim as in Noble Drilling and a third-party claim as in this case.  Nor did Poincon address the language of Rule 9(h)(2), even though the plain text of the rule seems to support the opposite result from the one reached in that case.  See Fed. R. Civ. P. 9(h)(2) ("A case that includes an admiralty . . . claim . . . is an admiralty case within 28 U.S.C. § 1292(a)(3).").

Moreover, we are not persuaded by the assertion in Poincon that "allow[ing] a defendant to re-designate a case as an admiralty case simply by seeking an interlocutory appeal under § 1292(a)(3) . . . [would] jeopardize the plaintiff's Seventh Amendment right to a jury trial," 9 F.4th at 295.  See Concordia Co. v. Panek, 115 F.3d 67, 70 (1st Cir. 1997) ("Generally, there is no constitutional right to [a] jury trial for admiralty claims.  Congress has, however, created a statutory right to a jury trial for certain admiralty claims." (citations omitted)).  Rule 9(h)(2) governs the circumstances under which a case "is an admiralty case within 28 U.S.C. § 1292(a)(3)."  Fed. R. Civ. P. 9(h)(2) (emphasis

added). That language does not address whether such a case would necessarily be an admiralty case within the Seventh Amendment, and at least some circuits have ruled that a party may have a right to a jury in a case with an admiralty claim. See Concordia, 115 F.3d at 70-72 (listing cases); In re Lockheed Martin Corp., 503 F.3d 351, 357-58, 360 (4th Cir. 2007) (listing cases and ruling that the defendant had a Seventh Amendment right to a jury trial for counterclaims brought in law despite the plaintiff having designated the original claims in admiralty); see also Fitzgerald v. U.S. Lines Co., 374 U.S. 16, 21 (1963) (holding that a seaman was "entitled to a jury trial" on a particular admiralty claim). So, for these reasons as well, we conclude that the United States has not persuasively argued that the third-party claims designated in admiralty here fail to make this case a "case that includes an admiralty or maritime claim" and, therefore, "an admiralty case within 28 U.S.C. § 1292(a)(3)." Fed. R. Civ. P. 9(h)(2).

Therefore, we conclude that, in accord with the plain text of Rule 9(h)(2), this case does include an admiralty claim because it includes the third-party claims, which the parties agree are themselves admiralty claims. See id. We see no basis for concluding that those claims are included in some other case rather than in this one.

**B.**

The United States separately argues that, even if this "case" does "include" the third-party claims, such that it is, for that reason, an admiralty case, 28 U.S.C. § 1292(a)(3) still does not confer appellate jurisdiction here. The United States contends that is so because the District Court's order granting partial summary judgment "did not 'determin[e] the rights and liabilities of the parties to admiralty cases'" as § 1292(a)(3) requires. (Quoting 28 U.S.C. § 1292(a)(3).) Here, as well, we disagree.

The United States argues that "[t]he use of the definite article in 'the parties' indicates that the order in question must determine the rights and liabilities of all the parties to the admiralty case, not just some." Thus, it contends that, because the order at issue on appeal "did not determine anything for the third parties" (whose claims, for purposes of this contention must be considered part of this case), we lack appellate jurisdiction under § 1292(a)(3).

In Martha's Vineyard, however, we exercised appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(3) over an interlocutory appeal of an order that concerned only some of the parties in the case. 833 F.2d at 1064. We held there that "[f]or an interlocutory order to be appealable under 28 U.S.C. § 1292(a)(3), it need not address all of the rights and liabilities at issue in the litigation." Id. Rather, we indicated, "[i]t

suffices that the order conclusively lashes down the merits of some particular claim or defense." Id.

True, our focus in Martha's Vineyard was on the phrase "the rights and liabilities." See id. at 1063. But we see no reason why that same logic should not apply to "the parties." The relevant provision here also uses the definite article in "the rights and liabilities," and we "easily" concluded that the appealed order in Martha's Vineyard "need not address all of the rights and liabilities at issue in the litigation." Other circuits have held similarly. See also Kingstate Oil v. M/V Green Star, 815 F.2d 918, 921 (3d Cir. 1987) ("To be appealable under [§] 1292(a)(3), an order in admiralty need not determine all rights and liabilities of all parties."); O'Donnell v. Latham, 525 F.2d 650, 652 (5th Cir. 1976) ("All the rights and liabilities of all the parties need not be determined before such an order is appealable.").

We note, too, that the purpose of § 1292(a)(3) is to allow parties to challenge a liability ruling prior to the costly evaluation of damages that is common in many admiralty suits. That purpose accords with permitting an appeal of a liability determination even when the third-party claims have not ripened. Suits of this nature frequently involve such claims. See Roberts v. Consol. Rail Corp., 893 F.2d 21, 25 (2d Cir. 1989) ("[T]he conventional wisdom is that a cause of action for indemnity does

not arise until at least judgment is rendered against the indemnitee, if not until actual payment of the judgment.").

True, this purpose would not accord with permitting this appeal if the third-party claims at issue here were not themselves part of this case. But, for the reason we have already explained, they are.

## C.

In sum, we conclude that we possess appellate jurisdiction under 28 U.S.C. § 1292(a)(3) over this interlocutory appeal because it is an appeal of an order "determining the rights and liabilities of the parties to [an] admiralty case[] in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a)(3). We therefore move on to the merits.

## III.

The defendants take aim at two distinct aspects of the grant of summary judgment to the United States on their § 2702(a) claims with respect to the issue of the defendants' liability for the alleged damages to natural resources. First, they contend that the District Court erred in granting summary judgment as to the defendants' liability because the United States seeks damages for injury to "natural resources" that are not "belonging to, managed by, controlled by, or appertaining to the United States," 33 U.S.C. § 2706(a)(1), and the District Court failed to address

whether the natural resources were of that specific kind. Second, the defendants argue that the District Court erred by granting summary judgment as to the defendants' liability to the United States based only on a review of whether the FOSC's "substantial threat" determination was arbitrary and capricious. They contend that, to assess the "substantial threat" element of liability for purposes of the United States's claims under § 2702(a), the District Court was obliged to determine whether the United States had shown by a preponderance of the evidence that the grounding of the vessel posed a "substantial threat of a discharge of oil" rather than merely whether, insofar as the FOSC determined that the grounding posed such a threat, the administrative record showed that the FOSC's determination was not arbitrary and capricious.

**A.**

We review a district court's grant of summary judgment de novo. Mullane v. U.S. Dep't of Just., 113 F.4th 123, 130 (1st Cir. 2024). "We must construe the evidence 'in the light most congenial to the nonmovant,' and will affirm the grant of summary judgment where the record 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'" Id. (quoting McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017)). Whether a district court applied the appropriate burden of proof standard is a legal question that we

review de novo.  See Trull v. Volkswagen of Am., Inc., 187 F.3d 88, 93 (1st Cir. 1999).

We review a district court's denial of a Federal Rule of Civil Procedure 56(d) motion for additional time to obtain evidence to oppose summary judgment for abuse of discretion. Rios v. Centerra Grp. LLC, 106 F.4th 101, 121 (1st Cir. 2024).  "To succeed, a party's Rule 56(d) motion typically must: '1) be timely; 2) be authoritative; 3) show good cause for failure to discover the relevant facts earlier; 4) establish a plausible basis for believing that the specified facts probably exist[;] and 5) indicate how those facts will influence the outcome of summary judgment.'"  Id. (quoting Pina v. Children's Place, 740 F.3d 785, 794 (1st Cir. 2014)).

**B.**

The parties characterize the question of whether the "natural resources" at issue in the United States's § 2702(a) claims are "belonging to, managed by, controlled by, or appertaining to the United States," 33 U.S.C. § 2706(a)(1), as one that implicates the United States's "standing" to bring these claims.  In this context, we emphasize, the reference to "standing" is not a reference to whether the United States has Article III standing to bring the claims.  Nor is it even a reference to whether we have statutory subject matter jurisdiction over the

claims. Instead, it is a reference to whether the United States can satisfy the element of the claims under § 2702(a) that requires the damages that the United States seeks to be for natural resources that -- to use the shorthand formulation -- it "manages or controls." See Vander Luitgaren v. Sun Life Assurance Co. of Canada, 765 F.3d 59, 62 (1st Cir. 2014) (explaining that the question that the statutory standing inquiry asks "is whether Congress has accorded this injured plaintiff the right to sue the defendant [under the particular statute] to redress his injury" (alteration in original) (quoting Graden v. Conexant Sys. Inc., 496 F.3d 291, 295 (3d Cir. 2007))). And that is because, under § 2706(a), a "responsible party" "shall be liable" to the United States for "natural resource damages" only if the damages are to natural resources that the United States (again, to use the shorthand formulation) "manages or controls." 33 U.S.C. § 2706(a)(1)-(a)(2).

The defendants contend that the United States has not -- and cannot -- show that it has a relationship to the coral reef and related marine life allegedly injured in the grounding of the tanker that suffices to make the "natural resources" at issue "natural resources" of that kind.[2] The defendants base this

---

[2] With respect to the subrogated claim that the United States brings on behalf of NPFC, the United States does not dispute the defendants' contention that it has statutory standing to bring

argument, in part, on the ground that, under a separate federal statute, the Federal Relations Act ("FRA"), 48 U.S.C § 749, the "natural resources" at issue in this case are exclusively Puerto Rico's. The defendants also argue, in the alternative, that the United States has failed to show, as a matter of law, that its relationship to the "natural resources" in question makes them "natural resources" "belonging to, managed by, controlled by, or appertaining to the United States," 33 U.S.C. § 2706(a), even if there is no statute that provides that those natural resources are exclusively "belonging to, managed by, controlled by, or appertaining to" Puerto Rico.

As we will explain, we do not agree with the defendants that the FRA grants Puerto Rico exclusive management and ownership over the natural resources at issue. We therefore also must address the defendants' argument in the alternative about whether

---

that claim under OPA only if the "natural resources" at issue are "belonging to, managed by, controlled by, or appertaining to the United States." See 33 U.S.C. § 2706(a). Thus, the United States does not dispute the defendants' contention that the fact that the subrogated claim seeks damages for the amounts paid out by the Fund does not change the "managed or controlled" inquiry. The United States agrees that "the government takes by subrogation only whatever claims NOAA had," and 33 U.S.C. § 2715(c) provides that "an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant . . . . may be commenced against any responsible party . . . who is liable . . . to the compensated claimant . . . for the cost or damages for which compensation was paid." 33 U.S.C. § 2715(c) (emphases added).

- 37 -

those natural resources are "managed or controlled" by the United States.

## 1.

As to the defendants' first argument, the FRA "placed under the control of the government of Puerto Rico" the "bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and waters, owned by the United States on March 2, 1917, and not reserved by the United States for public purposes."[3]  48 U.S.C § 749.  It also provides the following definition for "control":

> "[C]ontrol" includes all right, title, and interest in and to and jurisdiction and authority over the submerged lands underlying the harbor areas and navigable streams and bodies of water in and around the island of Puerto Rico and the adjacent islands and waters, and the natural resources underlying such submerged lands and waters, and includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such natural resources and submerged lands beneath such waters.

Id.

The defendants maintain that the FRA's "clear language" shows that the grant of "management rights" to Puerto Rico was exclusive because it granted "all . . . rights of management" to

---

[3] The parties do not dispute that the "natural resources" at issue in this case are covered by the FRA.

Puerto Rico. (Alteration in original) (emphasis added). It therefore follows, the defendants contend, that the natural resources in question cannot be "managed or controlled" by the United States.

We do not read the FRA as the defendants do, principally because we do not read it to have granted Puerto Rico "all" "rights of management." The FRA indicates that "'control' includes all right, title, and interest in and to and jurisdiction and authority over the submerged lands" and various natural resources. Id. (emphasis added). It then provides that "control" also "includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such natural resources and submerged lands beneath such waters." Id.

The defendants read the word "all" in the first clause to apply to the phrase "management rights" in the second. But there is no textual basis for doing so. The first clause begins with "includes" and ends with "natural resources underlying such submerged lands and waters," while the second clause begins with "and includes" and ends with "such natural resources and submerged lands beneath such waters." Id. Thus, the defendants' reading stretches the application of the word "all" further than the sentence's structure can bear. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152 (2012) ("When the syntax involves something other than a parallel series

of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent.").

Accordingly, we must reject the defendants' argument that the FRA's text shows that Puerto Rico has exclusive "management rights" over the natural resources at issue here. Thus, the FRA does not preclude the natural resources at issue from being "managed or controlled" by the United States.

## 2.

The defendants' alternative argument is that, even though natural resources may be "managed or controlled" by both the United States and Puerto Rico, see 40 C.F.R. § 300.615(a), there is no basis in the record for concluding that, as a matter of law, the United States has met its burden to show that it "manages or controls" the natural resources in question here. Accordingly, the defendants contend, the District Court erred in granting summary judgment to the United States on their claims as to the issue of liability.

The United States responds partly by treating the defendants as making an argument about the "zone of interests" and "prudential standing" and then going on to explain why that argument is mistaken. But because the defendants are not making any such argument, we move on to the United States's other responses.

The United States's most basic response is that the record establishes, as a matter of law, that the "natural resources" in question are "belonging to, managed by, controlled by, or appertaining to the United States" because it is beyond reasonable dispute that the United States "manages and controls" them "under various federal statutes."  The United States offers various reasons for our so concluding.

The United States's first reason is that "NOAA is the federal trustee for 'natural resources <u>managed</u> or <u>controlled</u> by other federal agencies and that are found in, under, or using waters navigable by deep draft vessels, tidally influenced waters, or waters of the contiguous zone, the exclusive economic zone, and the outer continental shelf.'"  (Citing 40 C.F.R. § 300.600.)  The United States fails to explain, though, how the damaged coral or related marine life is "managed or controlled by <u>other</u> federal agencies."  (Emphasis added.)  As a result, we have no basis for concluding that the natural resources are so managed or controlled, such that we could conclude on this ground that, as a matter of law, NOAA is the federal trustee of these natural resources.

The United States also argues that "[u]nder numerous statutes, <u>NOAA itself</u> manages discrete species of coral as well as the reef habitat they create for other resources such as fish, invertebrates, marine mammals, and sea turtles."  (Emphasis added.)  For this contention, the United States cites "the

Endangered Species Act, 16 U.S.C. § 1531 et seq., the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq., Coral Reef Conservation Act, 16 U.S.C. § 6401 et seq., the Coastal Zone Management Act, 16 [U.S.C.] § 1451 et seq., and Executive Order 13,089 (Jun. 11, 1998)." It also cites evidence within the record that it contends "identif[ies] species and their habitat in the area that may have been affected by a discharge" and other evidence that it contends "identif[ies] affected federally-managed habitat."

The mere fact that an agency has some regulatory authority over a natural resource, however, would not appear to suffice to show that it "manages or controls" that resource. To that point, in Ohio v. U.S. Department of the Interior, 880 F.2d 432 (D.C. Cir. 1989), the D.C. Circuit, addressing similar language in the context of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 94 Stat. 2767, as amended, 42 U.S.C. § 9601 et seq., indicated that:

> The difficult questions, obviously, center around the series of phrases: 'belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by' a state or federal or foreign government. . . . The legislative history of CERCLA further illustrates that damage to private property -- absent any government involvement, management or control -- is not covered by the natural resource damage provisions of the statute. . . . [A] substantial degree of government regulation, management or other form of control over the property would be

- 42 -

> sufficient to make the CERCLA natural resource damage provisions applicable. []For example, a state law requiring owners of tideland property to permit public access could well bring the land within the ambit of CERCLA's natural resource damage provisions.

Ohio, 880 F.2d at 459-61; see also Dep't of the Interior, Natural Resource Damage Assessments, 59 FR 14262-01, 14265 (March 25, 1994) (interpreting a CERCLA provision with similar language and declining to specify how far "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by" would reach, but emphasizing that not all private property would be covered).

The United States at no point explains -- or even addresses -- how the cited statutes show not merely that NOAA has regulatory authority over the natural resources in question but that it "manages or controls" them. For example, the United States does not point to any language within those statutes, does not point to any actions that NOAA took over these resources pursuant to the authority provided by those statutes, and does not provide information about affirmative duties, if any, imposed on NOAA by those statutes. It is not clear to us, therefore, how, in the United States's view, those statutes show that NOAA "manages or controls" the natural resources at issue.

We are aware, of course, that these statutes do impose certain obligations on the United States.[4] Thus, we do not mean to suggest that the United States does not "manage or control" the relevant natural resources through its fulfillment of its duties under those statutes, insofar as it has them with respect to those resources. But we have no clear argumentation about those duties or whether they suffice to satisfy the requirements of 33 U.S.C § 2706(a). Nor did the District Court provide a basis for concluding from those statutes that the "natural resources" at issue are "managed or controlled" by the United States.

Moreover, there are fact-based questions that concern which species were associated with the area in question at the time of the grounding that we do not understand to have been resolved below. The United States, in arguing that it "manages and controls" the resources at issue because of the various statutes it cites, points to evidence in the record that it contends "identif[ies] species and their habitat in the area that may have been affected by a discharge." The defendants contend, however, that "[T/V] Margara's grounding site was not habitat for

_____

[4] For example, the federal government has an affirmative duty to conserve listed species under the Endangered Species Act, see 16 U.S.C. § 1536(a); see also Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180-85 (1978), and shares responsibilities with regional councils to conserve and enhance essential fishing habitats under the Magnuson-Stevens Fishery Conservation and Management Act, see 16 U.S.C. §§ 1853(a)(7), 1855(b); 50 C.F.R. § 600.905(c).

any species listed, at the time, under the Endangered Species Act." Neither party suggests that the District Court made relevant findings on this issue, even though it appears that these facts could potentially bear on whether the United States does manage or control these resources.

The United States does also contend that the defendants are "liable" to it for the damages to these natural resources because the United States signed a Memorandum of Agreement ("MOA") with Puerto Rico that "establishes a co-trusteeship between the United States and Puerto Rico." The parties agreed below and on appeal that the injured natural resources were under the trusteeship of the United States. But the United States does not point to specific language within the MOA that would appear to authorize it to bring a claim for natural resources that are "belonging to, managed by, controlled by, or appertaining to" Puerto Rico and not to the United States, even assuming that such a memorandum of agreement could itself provide the required authority if that authority were otherwise lacking. And although the United States cites to 33 U.S.C § 2706(b)(1), a provision of OPA that allows the United States to assign a trustee for natural resources, the United States does not explain how, in its view, this provision interacts with 33 U.S.C § 2706(a), which governs the circumstances under which "liability shall be[] to the United States."

We therefore think it prudent to vacate and remand the District Court's seemingly implicit determination that these natural resources are "managed or controlled" by the United States. That way, the District Court may directly address the question of whether those natural resources are of that kind (while accounting for any other issues that may pertain to that question). This approach will also enable the District Court to make any factual findings that may be necessary to make to address that question.[5]

## IV.

Although we are remanding for consideration the issue of whether the pertinent natural resources are "managed or controlled by the United States," we see no reason not to address the defendants' other ground for challenging the ruling below -- namely that the District Court erred in granting summary judgment on liability due to the way that it chose to resolve the question of whether the record established that the grounding of the T/V Margara posed a "substantial threat of a discharge of oil."

---

[5] We understand the United States to have argued below and on appeal that it has the necessary relationship to the natural resources at issue here because it manages and controls the resources through the statutes it cites and because it is a purported trustee over the resources. No argument, however, was presented below or on appeal that the natural resources at issue in this case belong to or are appertaining to the United States. As such, we deem that argument waived. See United States v. Zannino, 895 F.2d 1, 9 n.7 (1st Cir. 1990).

Of course, if the District Court were to determine that the natural resources at issue are not "managed or controlled" by the United States, then it could deny summary judgment to the United States on that basis alone. But because the District Court may conclude that the natural resources are so "managed or controlled," we see little reason not to address the fully briefed and argued question of whether it was error for the District Court to resolve the "substantial threat" issue based on its determination that the FOSC did not act arbitrarily or capriciously in determining that the grounding posed such a threat. We note, though, that our decision as to this "substantial threat" issue does not obviate the need for the District Court to address the "managed or controlled" issue. The reason is that, if the defendants were to succeed in showing that the United States has not met its burden as to that issue, then the § 2702(a) claims would have to be dismissed on that basis alone -- and so without regard to whether the United States can prevail on the "substantial threat" issue.

To set the stage for our consideration of the "substantial threat" issue, we first need to review the District Court's ruling. We then will turn to the parties' arguments regarding the merits of that ruling.

**A.**

As a reminder, under 33 U.S.C. § 2702, the defendants here are "liable" for the "damages" at issue only if the vessel involved in the grounding posed a "substantial threat of a discharge of oil." 33 U.S.C. § 2702(a). The parties do not suggest otherwise. Their dispute concerns only the proper analysis that a court must undertake to determine whether, in assessing liability for such damages under § 2702(a), there was a "substantial threat of a discharge of oil."

The District Court conducted the analysis as follows. It first assessed whether the "substantial threat" determination had been "delegated" by Congress to the FOSC and reasoned that it had been so delegated pursuant to 33 U.S.C. § 2714(a) and associated regulations. It then decided that, due to that delegation, it had to "review" -- for purposes of assessing the defendants' liability for natural resource damages -- "the challenged 'substantial threat' determination" by the FOSC to determine whether the grounding posed a "substantial threat."

Further, the District Court concluded that a "substantial threat" determination by the FOSC is "an informal agency action" under the APA. It then concluded that the determination is reviewable only under the highly deferential arbitrary and capricious standard.

Finally, the District Court -- consistent with the United States's position below -- held both that the FOSC had determined that the grounding posed a "substantial threat" and that this determination was not arbitrary or capricious. As such, the District Court concluded that the United States had met its burden of proving that it was beyond reasonable dispute that there was a "substantial threat of a discharge of oil" for liability purposes.

In other words, the District Court rejected the defendants' contentions about how the "substantial threat" determination must be made for the purpose of assessing the defendants' liability under 33 U.S.C. § 2702(a). After all, in the defendants' view, no "agency action" was at issue with respect to the question of whether there was, in fact, a "substantial threat." Instead, they argued, the "substantial threat" showing is an element of a § 2702(a) claim. As a result, they argued that the District Court was not permitted to determine merely whether the FOSC's "substantial threat" determination -- insofar as the FOSC made one -- was arbitrary and capricious. They instead contended that the District Court was obliged to determine whether, under the preponderance of the evidence standard, it was more likely than not that the grounding posed a "substantial threat." And, given that the issue arose in connection with the United States's motion for summary judgment, the United States, on the

defendants' view, had to establish that there was no genuine issue of material fact as to whether it was more likely than not that the vessel in question posed such a threat.

In the alternative, the defendants contended in the District Court that -- even if the "substantial threat" determination had been delegated to the FOSC such that the FOSC's determination would be reviewed as an agency action -- review would still be de novo. The defendants asserted that de novo review would apply in that event because, under the APA, the agency's factfinding was inadequate. They further argued that de novo review would be required because application of arbitrary-and-capricious review of the FOSC's purported determination would violate the Due Process Clause.

**B.**

The defendants take issue on appeal with each of the District Court's analytic steps. We agree with the defendants that the requirement that an "occurrence" involving a "vessel" pose a "substantial threat of a discharge of oil," such that the "occurrence" constitutes "an incident" for purposes of § 2702(a), is an element of liability under § 2702(a). We thus agree that a court must assess the plaintiff's showing as to that element under the ordinary preponderance-of-the-evidence standard. Thus, because the District Court did not make any such assessment, we

- 50 -

need not address any of the fallback contentions that the defendants advance in challenging the District Court's ruling.

"[T]he ordinary rule in civil cases is proof by a preponderance of the evidence," with departures from that rule only when "dictated by statute." Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 192 (1st Cir. 2012). The United States argues that such a departure is warranted here, because "[w]here Congress delegates administrative decisions to agencies, judicial review of those decisions employs the APA's arbitrary-or-capricious standard."

Below, as we have noted, the District Court discerned such a delegation from 33 U.S.C. § 2714(a) and associated regulations. But the defendants rightly observe that § 2714(a) "does not instruct the President to adjudicate that there was an incident (much less to establish any party's liability)," and, on appeal, the United States indicates that it "agrees that [§ 2714(a)] is not pertinent" and does not defend that basis for the District Court's judgment. We accept the United States's concession in that regard.

The United States nonetheless maintains that we may affirm the District Court's judgment on the ground that 33 U.S.C. § 1321(c) delegates to the U.S. Coast Guard the authority to make "substantial threat" determinations for the purposes of § 2702(a) liability. See Brox v. Hole, 83 F.4th 87, 98 (1st Cir. 2023)

("[W]e may affirm the District Court on an independent ground if that ground is manifest in the record."). Section 1321(c), which appears in the Federal Water Pollution Control Act ("FWPCA") -- not OPA -- provides, in relevant part, that "[t]he President shall, in accordance with the [NCP] . . . ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil." 33 U.S.C. § 1321(c)(1)(A) (emphasis added).

Given that the section appears to require that the United States "ensure . . . mitigation or prevention of a substantial threat of a discharge[] of oil," id., the United States argues that the substantial threat determination for purposes of § 2702(a) of OPA has been "delegated" to the Coast Guard. After all, the United States reasons, liability for damages to natural resources under this provision exists when there is a "substantial threat of a discharge of oil." The United States thus argues that the FOSC's determination in this case that there was a substantial threat is binding, if not arbitrary and capricious, as to whether there was a "substantial threat" for purposes of the defendants' liability for the OPA claims at issue.

As the defendants point out, however, nothing on the face of § 2702(a) delegates the determination of whether the "substantial threat" element of such a claim has been satisfied to the FOSC, or, for that matter, any other agency actor. See id.

- 52 -

§ 2702(a). Nor does § 2702(a), on its face, indicate that this element of a claim brought pursuant to this provision of OPA is keyed to the determination that the FOSC may have made to guide its own response pursuant to § 1321(c) of the FWPCA. Indeed, there is no reference in § 2702(a) to any such determination. Rather, § 2702(a) of OPA states in relevant part:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that result from such incident.

Id. § 2702(a).[6]

We thus conclude that there has been no delegation to the FOSC -- or, for that matter, any other agency actor -- of the determination that is relevant to the defendants' liability as to the United States's § 2702(a) claims. And that is so even accepting that § 1321(c) does delegate to the FOSC the authority to make a "substantial threat" determination to inform the United

---

[6] To be sure, 33 U.S.C. § 2702(a) refers to both a "responsible party," defined as "any person owning, operating, or demise chartering the vessel" at issue, id. § 2701(32), and an "incident," defined as "any occurrence . . . resulting in the discharge or substantial threat of discharge of oil," id. § 2701(14). OPA's reference to, and definition of, those terms, however, does not indicate that § 2702(a) impliedly delegated the "substantial threat" determination to an agency actor. Id. § 2702(a).

- 53 -

States's own response actions -- under § 1321(c) the United States "shall" respond to a "substantial threat."  After all, we fail to see why it follows that the determination there is binding, if not arbitrary and capricious, for purposes of adjudicating whether the "substantial threat" element under § 2702 has been satisfied.

This conclusion draws support from the fact that OPA expressly requires deferential judicial review of an agency finding with respect to assigning damages, rather than liability, for an "incident."  Specifically, OPA provides that "[a]ny determination or assessment of damages to natural resources . . . by a . . . trustee . . . shall have the force and effect of a rebuttable presumption."  Id. § 2706(e)(2) (emphasis added).  That OPA expressly provides for a "rebuttable presumption" for a trustee's findings as to the amount of natural resource damages, id. § 2706(e)(2), makes more conspicuous the absence of any similar language with respect to an FOSC's finding of a "substantial threat" pursuant to § 1321(c) in an OPA liability suit brought under § 2702.  Dep't of Homeland Sec. v. MacLean, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.").

Our 2007 decision in United States v. JG-24, Inc., 478 F.3d 28 (1st Cir. 2007), further supports our conclusion, notwithstanding that it is the United States that invokes this

precedent on appeal as if it supports its position. In that case, the United States brought an action under CERCLA against several facilities to recover the costs of its "removal action" that it conducted to remove "hazardous substances" released by those facilities. Id. at 30-31.

In relevant part, CERCLA imposes liability for "all costs of removal or remedial action incurred by the United States . . . not inconsistent with the [NCP]" if enumerated requirements are met. 42 U.S.C § 9607(a)(4)(A). In JG-24, the defendants argued that because the United States had failed to follow its own regulations in carrying out the alleged "removal action," it "c[ould not] satisfy the CERCLA definition of a 'removal action.'" 478 F.3d at 31. Thus, under the defendants' own framing in that case, their liability turned on whether the United States had conducted a "removal action" -- or, put otherwise, on the propriety and classification of the government's response to an incident. Id.

The United States contends that the fact that we applied arbitrary and capricious review in JG-24 to "the EPA's decision whether to conduct a removal action," id. at 32, supports application of that same standard here. Not so.

The present case is quite different. No party contends that any government action must have been undertaken for a "responsible party" to be "liable" for "natural resource damages"

under § 2702(a).  For example, the United States does not contend that a responsible party is liable for natural resource damages under OPA only if the FOSC responds to an incident.  In fact, the United States suggests that the duties of "federal response officials to respond to spills and threatened spills [cannot] diminish the liability of parties responsible for such spills."

Moreover, § 2702(a), by its plain language, imposes liability on responsible parties if there is a "substantial threat of a discharge of oil," not if the government responds to such a threat.  Thus, even if the "substantial threat" determination is delegated to the FOSC for the purposes of § 1321(c) of FWCPA, we see nothing in JG-24 that suggests a reason to conclude that liability for natural resource damages under § 2702(a) of OPA turns on that delegated decision.

We recognize that this conclusion differs from the one reached in the sole case the United States identifies as having adopted its view: United States v. Kilroy & Associates, Inc., No. 08-1019, 2009 WL 3633891 (W.D. Wash. Oct. 30, 2009).  In that unpublished decision, the district court treated the "substantial threat" determination as an "administrative decision" and concluded that "review" was "extremely curtailed."  Id. at *5.

The district court reached that conclusion in that case by relying on another case that applied arbitrary-and-capricious review to determine whether the United States's claimed "removal

costs" were unreasonable. Id. (citing United States v. Hyundai Merch. Marine Co., 172 F.3d 1187, 1191 (9th Cir. 1999)) (noting that the court found "no Ninth Circuit case law interpreting the OPA on th[e] precise subject" at issue). But, as we explained in our discussion of JG-24, even if arbitrary-or-capricious review applies to whether an agency's expenditures are valid "removal costs" under OPA, it does not follow that the same standard should apply to whether or not an incident posed a "substantial threat." Thus, to the extent that Kilroy viewed these situations as "remarkably analogous," 2009 WL 3633891, at *5, we cannot agree. See also United States v. Brothers Enters., Inc., 113 F. Supp. 3d 907, 912, 915-16 (E.D. Tex. 2015) (applying de novo standard to whether an incident posed a substantial threat).

We note as well that the district court in Kilroy emphasized that "the factual materials before it are conspicuously one-sided," 2009 WL 3633891, at *3, that "[t]he undisputed facts show that . . . oil [was] released by the [v]essel[]," id. at *6, and that the defendants "[did] not submit[] any material to the [c]ourt that would call into question the" substantial threat determination, id. at *5. We are, thus, especially hesitant to apply the standard adopted in Kilroy here, given that the district court there did not appear to have had the benefit of adversarial testing. Instead, the court there made clear that it was not required to address the "substantial threat" issue because the

undisputed facts showed an actual discharge of oil. See 33 U.S.C. § 2702(a) (imposing liability for actual discharge of oil or the substantial threat of a discharge of oil).

As for the other cases that the United States cites as support, it expressly acknowledges in its briefing that they are not "directly on point." And we agree that they are readily distinguishable for reasons similar to those presented above.

The United States does also invoke various provisions of the APA in arguing that the FOSC's "substantial threat" determination is subject to arbitrary or capricious review. But we do not understand the United States to contend that these provisions have any relevance here if § 1321 does not delegate the substantial threat determination to the U.S. Coast Guard.

In sum, we see no basis to deviate in this case from "the ordinary rule in civil cases[, which] is proof by a preponderance of the evidence." Fishman Transducers, 684 F.3d at 192. That said, the defendants do not appear to dispute on appeal that evidence of an FOSC's "substantial threat" determination may still be relevant -- under the preponderance standard -- to whether an incident did pose such a threat, and we see no reason why such evidence may not be considered in assessing whether it is more likely than not that the vessel here posed such a threat.

## c.

There remains the question of whether vacatur or reversal of the grant of summary judgment is appropriate. The defendants contend that reversal is required because whether the grounding posed a "substantial threat" is a disputed fact, material to the issue of liability, and because they have not yet had an opportunity for discovery. See Ríos-Campbell v. U.S. Dep't of Com., 927 F.3d 21, 25 (1st Cir. 2019) ("[A] district court 'should refrain from entertaining summary judgment motions until after the parties have had a sufficient opportunity to conduct necessary discovery.'" (citing Vélez v. Awning Windows, Inc., 375 F.3d 35, 39 (1st Cir. 2004))).

Below, the United States predicated its summary judgment motion on the applicability of the arbitrary and capricious standard. It advanced no argument that it is entitled to summary judgment if the appropriate standard is preponderance of the evidence. It also does not advance any such argument on appeal. Nor do we see how the United States could have made such an argument, given the lack of discovery and the evident dispute about the likelihood of a discharge of oil from the grounding. We thus reverse the District Court's grant of partial summary judgment and remand to the District Court for further proceedings consistent with this opinion.

**V.**

For the foregoing reasons, we **vacate** the District Court's decision in part, **reverse** the District Court's grant of partial summary judgment, and **remand** for further proceedings consistent with this opinion. The parties shall bear their own costs.